344 So.2d 915 (1977)
Reginald Evans SMITH, Appellant,
v.
STATE of Florida, Appellee.
No. Z-100.
District Court of Appeal of Florida, First District.
April 6, 1977.
Rehearing Denied May 11, 1977.
*916 Walter G. Arnold, of Arnold, Stratford & Booth, Jacksonville, for appellant.
Robert L. Shevin, Atty. Gen., Wallace E. Allbritton and Richard L. Wilson, Asst. Attys. Gen., for appellee.
BOYER, Chief Judge.
Appellant was indicted for first degree murder, tried by a jury and convicted of second degree murder. He now urges several grounds for reversal, claiming that: The attempted cover-up of the murder became a feature and the homicide an incident of the trial; his wife, in derogation of the marital privilege, was allowed to testify as to certain statements made by him to her; the prosecutor made prejudicial comments in his opening and closing statements to the jury; and the instructions given to the jury were deficient because the jury was misled as to a killing committed by virtue of unrestrained passion or ungoverned temper, and because the jury was not read an instruction relative to the testimony of an accomplice contended to be applicable to the wife's testimony.
On June 30, 1974, appellant shot and killed Jose Fernandez DeCastro. The state established that on that date, shortly after appellant left his home to go to his place of employment, his wife received a telephone call from DeCastro, who then proceeded to appellant's home where he picked up Mrs. Smith. The couple visited a local nightclub where they had a drink, danced, and talked. *917 When they returned to appellant's residence around 2:00 a.m., the telephone was ringing. When Mrs. Smith picked up the phone and discovered that there was no one at the other end, she realized it was her husband who had the habit of checking up on her by calling her up and then putting the telephone on hold. When she hung up the telephone, appellant immediately called again and inquired where she had been. Mrs. Smith answered that she had been asleep. She then fastened the safety latch on the door and fixed herself and Mr. DeCastro a drink. Appellant, in the meantime, decided to return home. When he arrived, he noticed the DeCastro car parked in front of his house. Looking through the glass partition in the front door he also noticed Mr. DeCastro's boots in the foyer. After attempting to enter the home and finding that the safety latch was secured, appellant kicked the door open, drew his gun and shot DeCastro two times.
In addition to proving the killing itself, largely through the testimony of the wife, the state also sought to present evidence concerning the cover-up of the crime. The wife described in vivid detail how she and her husband removed the body from the home, wrapped it up and buried it in a secluded spot. The defense vociferously objected to such evidence on the grounds of relevancy and materiality, that the evidence showed an independent offense for which appellant was not charged and that it was calculated merely to prejudice appellant without any evidentiary value to prove the offense for which he was charged. The objection was overruled. Defense counsel also objected to testimony of the wife during which she related conversations between herself and her husband occurring after the shooting, the ground of objections being that such testimony invaded the confidential privilege between husband and wife. With but a few exceptions, the objections were overruled.
The defense asserted at and before trial the defense of temporary insanity and that appellant could at worst be found guilty of manslaughter. The psychiatrists called by the defense supported the insanity theory but the state's psychiatrists testified contra.
Appellant initially claims that the state made the attempted cover-up of the homicide the feature and the homicide an incident of the trial, thereby depriving him of a fair trial. On that point, the wife's testimony is most significant. Her testimony of the events leading up to the homicide and of the homicide itself, contained in 37 pages of trial transcript, is concise yet descriptive. Her testimony of the burial of the body and cover-up, covering 115 pages of trial transcript, presents an intricately drawn picture of the words and deeds of appellant from the time immediately after the homicide until his arrest. Specifically, the wife told how she and her husband disposed of the body, using plastic garbage bags, cords, mattress covers, a shovel, and an ax; how, after the body was buried, they disposed of the deceased's automobile and returned home where, after showering and changing clothes, they went to a country club for dinner; how, the next day, they burned the couch upon which the victim was sitting when he was shot and concealed the remains thereof. In short, the wife's version of the attempted cover-up was both extensive and complete.
Upon careful consideration of the trial testimony, we have concluded that the inquiry conducted by the state concerning the cover-up transcended the bounds of relevancy and became a feature of the case instead of the crime charged in the indictment. (See Williams v. State, 117 So.2d 473 (Fla. 1960).) Numerous decisions have applied the so-called Williams rule. (See Simmons v. Wainwright, 271 So.2d 464 (Fla. 1st DCA 1973); Randall v. State, 239 So.2d 81 (Fla. 2d DCA 1970); Lucas v. State, 257 So.2d 261 (Fla. 1st DCA 1971).)
The state counters that evidence of the cover-up was to show the state of mind of the accused, relevant in light of appellant's insanity defense. Appellant concedes, and we agree, that the state was entitled to show that the body of the deceased was removed from the home and buried in a secret location, and that appellant tried to *918 conceal the homicide. The issue, however, is not resolved by a bare finding of relevancy. We have held in other contexts that the trial court must engage in a balancing process to determine whether the relevancy of certain evidence is outweighed by the potential prejudice to the defendant. (See Josey v. State, 336 So.2d 119 (Fla. 1st DCA 1976); see also Dodson v. State, 334 So.2d 305 (Fla. 1st DCA 1976); and Colbert v. State, 320 So.2d 853 (Fla. 1st DCA 1975).) Although it is extremely difficult to delineate the exact point at which the state may be said to have gone too far in the presentation of collateral matters, we can identify certain factors that are helpful in balancing the relevancy of evidence of collateral matters against the potential prejudice to a defendant. One factor is the issue of relevancy itself. To what extent is the objectionable evidence relevant? Clearly, testimony as to the events occurring immediately subsequent to the homicide are relevant to the insanity issue. Evidence that appellant acted coolly and calmly after the shooting was consistent with the state's psychiatric testimony that a person who was temporarily insane at the time of the homicide would continue to remain in that condition for some time afterwards. However, the objectionable evidence, relating to deeds after the killing, would not be relevant to the issue of whether the crime was committed in such a heinous manner as to justify the death penalty. (See Halliwell v. State, 323 So.2d 557 (Fla. 1975).)
A second factor is the necessity of the testimony. How important is the testimony to the state's case? Sub judice, appellant had conceded that the killing and cover-up had occurred, and indicated that he was relying on extenuating circumstances as his defense. Consequently, the state's need to introduce every shred of evidence and every word of testimony at its disposal was reduced.
A third factor might be termed "quality of testimony". Was the testimony directly related to the material issues of the case, or was it more inclined to demonstrate the bad character of the accused, thereby unduly prejudicing him? Sub judice, some aspects of the testimony presented at trial could have served no purpose other than to assault appellant's character. Illustrative of such evidence is testimony concerning appellant dragging the body of the deceased to the clandestine grave site, his jumping on the victim's knees in order to flatten them out in the grave, and throwing away the deceased's bibles, prayer books, screwdriver and class ring.
The several factors discussed and applied above are by no means exclusive. They should be, however, helpful analytically and have aided this court in arriving at our decision in this case. The inescapable conclusion is that the State engaged in overkill and that thereby appellant was deprived of a fair trial.
Appellant further urges, on the basis of the marital privilege, that the wife should not have been allowed to testify as to certain comments made to her by appellant after the shooting.[1] Over appellant's objection, the wife was permitted to testify that immediately after killing Mr. DeCastro, appellant, when asked by his wife what he had done, replied, "I killed him." In other conversations as related by the wife, appellant told her to lock up the cat and keep it away from the victim's body, instructed his wife as to the method of removing the body so that if an investigator should come by the house the body would not be found, stated how the body should be buried so that it would never be found, and informed her that the couch on which the deceased had been sitting when killed would have to be burned. The trial court determined that most of the statements made by appellant to his wife after the shooting would be admissible on the basis that the statements were made not by reason of the existence of the marital relationship, but because his *919 wife happened to be the person who had witnessed the murder and cover-up.
The commonlaw privilege regarding confidential communications between husband and wife has been consistently followed in Florida. The policy underlying the marital privilege was well expressed in Mercer v. State, 40 Fla. 216, 24 So. 154 (Fla. 1898):
"Society has a deeply-rooted interest in the preservation of the peace of families, and in the maintenance of the sacred institution of marriage; and its strongest safeguard is to preserve with jealous care any violation of those hallowed confidences inherent in, and inseparable from, the marital status. Therefore the law places the band of its prohibition upon any breach of the confidence between husband and wife, by declaring all confidential communications between them to be incompetent matter for either of them to expose of witnesses. * * * The matter that the law prohibits either the husband or wife from testifying to as witnesses includes any information obtained by either during the marriage, and by reason of its existence. It should not be confined to mere statements by one to the other, but embraces all knowledge upon the part of either obtained by reason of the marriage relation, and which, but for the confidence growing out of it, would not have been known." 24 So. at 157
More recent cases have reiterated the public policy expressed in the Mercer decision. (Cox v. State, 192 So.2d 11 (Fla. 3d DCA 1966).) However, the precise questions regarding marital privilege raised in this appeal have apparently never before been considered by a Florida appellate court.
The initial query is whether the trial court properly admitted most of the conversations which occurred between appellant and his wife after the shooting on the basis that the statements made by appellant to his wife were made incidental to, rather because of, the marital relationship. In light of the status of the record and the strong public policy in favor of the marital privilege we find that the conclusion reached by the trial court as well as the method employed in arriving at that conclusion is unacceptable. The great danger inherent in an inquiry concerning causation of an otherwise confidential conversation between husband and wife is the potential chilling effect upon the policy underlying the marital privilege. A married couple should be secure in the knowledge that their private communications will be protected and will not be susceptible to exposure by an after-the-fact determination that the communications did not arise as a direct result of the marital relationship.
The state has attempted by other reasoning to justify the trial court's admission into evidence of appellant's statements to his wife. First, the state argues that, as with the attorney-client privilege, the marital privilege should not apply to communications made in the furtherance of a crime. (See Kneale v. Williams, 158 Fla. 811, 30 So.2d 284 (1947).) We refuse to engraft such an exception upon the marital privilege, again because of the harm it would inflict upon the strong policy underlying the privilege.[2]
The state further asserts that the statements made by appellant immediately following the shooting were part of the res gestae, making his words verbal acts rather than communications, and thus taking them outside the scope of the privilege. From our review of the record, however, it appears that most of the statements made by appellant which were introduced into evidence were made too remote in time after the shooting to be considered a part of the res gestae. Moreover, one of the more damaging statements made by appellant wherein he admitted the killing to his wife, was made as a direct result of a question posed to him by his wife. The statement *920 therefore lacked the element of spontaneity which is required of res gestae statements.
The state maintains that even if the wife's testimony was erroneously admitted, such was merely harmless error, especially because the wife could properly testify as to appellant's numerous acts performed in the cover-up of the crime. Independent of our holding as expressed in the first part of this opinion that the wife should not have been allowed to minutely describe each and every facet of the cover-up, we note that certain comments made by appellant to his wife about which the wife testified at trial were devastating to appellant's case. Appellant's confession of guilt, his instructions regarding the removal and burial of the body, and the plans to destroy pertinent evidence were extremely prejudicial and refute the state's harmless error argument.
The third point raised by appellant alleges that the prosecutor unfairly prejudiced the jury so as to deprive appellant of a fair trial by stating in his opening statement that appellant had taken money from the body of the deceased, which statement was not substantiated by the evidence.[3] Because of our disposition of the case on the other points, we find it unnecessary to further discuss that point.
Appellant next complains that comments made by the prosecutor during his closing argument constituted a direct or indirect comment on his failure to testify, contrary to Fla.R.Crim.P. 3.250. In Trafficante v. State, 92 So.2d 811 (Fla. 1957) the prosecutor in closing argument stated that the defendants had failed to contradict the testimony of a certain witness, Dietrich, as to a particular conversation. The Supreme Court concluded, "* * * In the instant case the witness Dietrich was relating to a conversation which took place between him and the two appellants. No one else was present `in the car' during said conversation. Consequently the remarks of the State Attorney could not have been directed `to a failure to submit the testimony of other witnesses.'"
Similarly, in the case sub judice, the prosecutor remarked:
"* * * and do you think if her story was not true they would not have called somebody in there to tell you it was not true? Do you think they would have done that? * * *"
"She witnessed this thing; she's therefore the principal witness in this thing. She's  there is no question about it, she is the one that was there, the only one living that was there to come before you and testify. And what of the fact that she participated in the cover-up? She admitted `I helped bury, I helped dig the grave, I burned the identification. Yes, I did.' At whose direction? This man right here. Has there been any evidence to refute that? No, there has not. There's not been a shred of evidence from the psychiatrist or anybody else that says that that is not the case. All of this was at his direction, not her own." (Emphasis added)
Appellant's motion for mistrial made at the conclusion of the above-quoted remarks should have been granted. The comment that appellant's wife was the only living person to testify as to the homicide and cover-up when coupled with the assertion that if the wife's story was not true then the defense would have produced someone to refute it amounts to a comment upon appellant's failure to take the witness stand. Such comment is ground for reversal and cannot be held to be harmless error. (Trafficante v. State, supra; Childers v. State, 277 So.2d 594 (Fla. 4th DCA 1973), cert. den., 285 So.2d 23 (Fla. 1973).)
According to appellant, certain of the trial court's instructions were misleading. In its instructions on insanity, the trial court stated that unrestrained passion or ungovernable temper was not insanity and was no excuse for the commission of a crime. The court further stated in its instruction *921 on excusable homicide that a homicide committed by accident and misfortune in the heat of passion committed upon sudden and sufficient provocation or sudden combat accomplished by the use of a dangerous weapon or in a cruel or unusual manner would be manslaughter. Appellant urges that, taken as a whole, the instructions misstate the law, because a killing done in heat of passion can reduce murder to manslaughter, citing Febre v. State, 158 Fla. 853, 30 So.2d 367 (1947).
Although the instructions, as given, were not so misleading as to require reversal, we do suggest that the trial court take steps upon the retrial of this case to avoid any potential confusion. First, defendant's requested instruction number 41[4] which brings together all of the homicide instructions should be given. Second, that portion of the insanity instruction which states that unrestrained passion or ungovernable temper is "no excuse for the commission of a crime" should be deleted as it has been in the most recent instructions promulgated by the Supreme Court. See No. 2.10(b)-1, Standard Jury Instructions in Criminal Cases, Second Edition.
Finally, appellant asserts that the trial court, with reference to appellant's wife, should have given an instruction regarding the testimony of an accomplice.[5] The trial court correctly refused to give the requested instruction. The wife did not take part in the crime with which defendant was charged, i.e., murder. Moreover, the trial court had already properly instructed the jury concerning the credibility of the witnesses and the weight to be afforded their testimony.
For the reasons expressed above, the cause is reversed and remanded for a new trial.
REVERSED AND REMANDED.
RAWLS, J., concurs.
McCORD, J., dissents.
NOTES
[1] The numerous activities of appellant about which the wife testified are not covered by the marital privilege which only applies to communications. Ross v. State, 202 So.2d 582 (Fla. 1st DCA 1967).
[2] Even § 90.504, Fla. Stat. (Supp. 1976), a part of the newly enacted Florida Evidence Code, which becomes effective July 1, 1977, would not except from the privilege the objectionable testimony under the facts sub judice.
[3] The prosecutor sought to elicit from the wife the fact that appellant, before burying the victim, removed an amount of money from the victim's body, but that testimony was not allowed into evidence by the trial judge.
[4] That requested instruction reads as follows: "The killing of a human being, by the act, procurement, or culpable negligence of another, in cases where such killing shall not be justifiable or excusable homicide, as herein defined, nor murder in any of its degrees is manslaughter. Thus killing done in sudden heat of passion, without any premeditated design to effect death, but not being done under such circumstances as would make it excusable homicide, as hereinafter defined, would be manslaughter."
[5] The requested instruction is a recitation of No. 2.12(d), Florida Standard Jury Instructions in Criminal Cases, which reads as follows:

"ACCOMPLICE DEFINED When two or more persons take part in the commission of a crime, each is an accomplice of all the others. WEIGHT OF TESTIMONY The testimony of an accomplice must be received with great caution and carefully and closely examined by you before a conviction is based upon it. This is particularly true when there is neither direct testimony nor circumstances to corroborate the testimony of the accomplice. Moreover, the testimony of an accomplice, even though uncorroborated, is sufficient upon which to base conviction if you are convinced by it of the defendant's guilt beyond a reasonable doubt.