537 So.2d 1383 (1989)
Harold Grant SNOWDEN, Sr., Appellant,
v.
The STATE of Florida, Appellee.
No. 86-1249.
District Court of Appeal of Florida, Third District.
January 24, 1989.
Rehearing Denied March 2, 1989.
Bennett H. Brummer, Public Defender, and Bailey, Gerstein, Rashkind & Dresnick and F. Lee Bailey and Paul M. Rashkind, Sp. Asst. Public Defenders, for appellant.
Robert A. Butterworth, Atty. Gen., Janet Reno, State Atty., and Paul Mendelson, Asst. State Atty., for appellee.
Before HUBBART, NESBITT and DANIEL S. PEARSON, JJ.
DANIEL S. PEARSON, Judge.
Harold Grant Snowden appeals his convictions on five counts of sexual battery on two children: LB, a female aged four, and her infant brother, JB, aged six months. While we find no merit in any of the numerous points on appeal raised by Snowden, we find worthy of discussion Snowden's contention that the introduction by the State of evidence to show that the defendant had committed on two other children (a five-year-old boy named GW and a six-year-old girl named KM) similar acts of sexual battery  conceded by the defendant to be unobjectionable on relevancy grounds  infringed upon his right to a fair trial when, in violation of Williams v. State, 117 So.2d 473 (Fla. 1960), this otherwise admissible evidence became a feature of the trial rather than a minor part of it.

I.

A.
The sanctioned use of similar fact evidence to establish a fact or facts in issue in a criminal prosecution continues to be *1384 fraught with the danger of convicting a person not for the crime charged, but for his criminal propensities or bad character. The concern is that "the jury may choose to punish the defendant for the similar rather than the charged act, or the jury may infer that the defendant is an evil person inclined to violate the law." Huddleston v. United States, ___ U.S. ___, ___, 108 S.Ct. 1496, 1499-1500, 99 L.Ed.2d 771, 780 (1988).
"There is no doubt that this admission [to prior unrelated crimes] would go far to convince [persons] of ordinary intelligence that the defendant was probably guilty of the crime charged. But, the criminal law departs from the standard of the ordinary in that it requires proof of a particular crime. Where evidence has no relevancy except as to the character and propensity of the defendant to commit the crime charged, it must be excluded."

Jackson v. State, 451 So.2d 458, 461 (Fla. 1984) (quoting with approval Paul v. State, 340 So.2d 1249, 1250 (Fla. 3d DCA 1976)).
See Peek v. State, 488 So.2d 52 (Fla. 1986). But notwithstanding the danger posed by the admission of similar fact evidence, the Florida Supreme Court has for some time adhered to a broad rule of admissibility based on the relevancy of the evidence to a fact to be proved. Williams v. State, 110 So.2d 654 (Fla. 1959) [Williams I] (affirming rape conviction where two witnesses, in rebutting anticipated defense of consent, testified to a similar act committed by defendant).[1] This rule that relevant evidence is admissible even if it points to the commission of another crime is now codified in the Florida Evidence Code:
"Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity."
§ 90.404(2)(a), Fla. Stat. (1987).

B.
A year after Williams I, the Florida Supreme Court announced the counterpoise to that decision. In Williams II, [Williams v. State, 117 So.2d 473 (Fla. 1960)], where evidence establishing that the murder weapon had been found in the defendant's car also established that the weapon had been found in the course of the investigation of a later murder-robbery committed by the defendant, the court reversed the murder conviction and sentence of death:
"Inasmuch as evidence of the later crime was admissible only because of its relevancy to the identity of the accused and the murder weapon and the similarity of the pattern defined in the two incidents, the question then arises whether or not the State was permitted to go too far in introduction of testimony about the later crime so that the inquiry transcended the bounds of relevancy to the charge being tried, and made the later offense a feature instead of an incident. This may not be done for the very good reason that in a criminal prosecution such procedure devolves from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant whose character is insulated from attack unless he introduces the subject.
"In the present case we are convinced that the testimony about the subsequent crime was so disproportionate to the issues of sameness of perpetrator and weapon and of design that it may well have influenced the jury to find a verdict *1385 resulting in the death penalty [rather than recommending mercy]... ."

Williams v. State, 117 So.2d at 475-76 (emphasis in original omitted; other emphasis added).
Following Williams II, courts have looked favorably upon the contention that the similar offense was made "a feature instead of an incident" of the trial on the charged offense where it could be said that the similar fact evidence had so overwhelmed the evidence of the charged crime as to be considered an impermissible character attack. Thus, in Reyes v. State, 253 So.2d 907, 907 (Fla. 1st DCA 1971), the court declared that
"At the conclusion of defendant's case, the State adduced a number of witnesses who testified for a period of almost two days as to prior illegal drug transactions indulged in by defendant. At this stage, the trial progressively developed into a general inquiry as to defendant's character, his propensity to indulge in criminal activities and the numerous crimes he had committed over a long period of time. One hundred forty one pages of this record is devoted to the alleged impeachment of defendant's testimony that he had not used drugs, other than those which were prescribed, prior to the date of his arrest. The rebuttal testimony is replete with evidence of prior specific crimes and hearsay testimony. The feature of the trial quickly faded into the spotlight of a sideshow focusing on the character, general reputation and propensity of defendant Reyes to engage in criminal activities. The Anglo-Saxon system of jurisprudence has not sanctioned such trials since the era of the Star Chamber."
See also Matthews v. State, 366 So.2d 170 (Fla. 3d DCA 1979); Knox v. State, 361 So.2d 799 (Fla. 1st DCA 1978). It is well settled, then, that the rule "that the State should not be permitted to make the evidence of other crimes the feature of the trial" is a limitation on the rule of relevancy. Bryan v. State, 533 So.2d 744, 746 (Fla. 1988).[2]
It is clear, however, that similar fact evidence will not be considered to be a feature of the case merely because a large amount of it comes before the jury.[3][4] More is required for reversal than a showing that the evidence is voluminous.

*1386 "In itself the mere volume of testimony concerning the prior crime would not necessarily make it a `feature'... . However, when considered with the additional fact that no limiting instruction was given, the prior crime could well have become a `feature instead of an incident' of the instant case in the jury's mind. They could not be expected to know for what limited purpose the evidence of the prior crime was admitted."

Green v. State, 228 So.2d 397, 399 (Fla. 2d DCA 1969).
Thus, in Townsend v. State, 420 So.2d 615, 617 (Fla. 4th DCA 1982), the court stated that "the number of pages of testimony and exhibits should not be the sole test by any means" and went on to conclude that the jury had not been overwhelmed by the evidence because it had been given cautionary instructions no less than twelve times and, despite the quantity of evidence pertaining to the collateral crimes, had acquitted the defendant of one of the charged murders. Likewise, in Headrick v. State, 240 So.2d 203 (Fla. 2d DCA 1970), the court affirmed the defendant's convictions of the burglary and grand larceny crimes charged  rejecting the defendant's argument that the State's evidence covered so many different and separate transactions that it "transcended relevance" and, by its volume (nine witnesses called to establish six other burglaries), constituted an effort by the State to show the bad character or criminal propensities of the accused. See Rogers v. State, 511 So.2d 526 (Fla. 1987) (evidence of two other robberies did not become feature of case); Stano v. State, 473 So.2d 1282 (Fla. 1985) (same; evidence of eight other murder convictions in sentencing proceedings); Burr v. State, 466 So.2d 1051 (Fla. 1985) (same; evidence of three other incidents); Wilson v. State, 330 So.2d 457 (Fla. 1976) (same; "extremely extensive" similar fact evidence that spanned over 600 pages approached but did not reach outer boundary where prejudice begins to outweigh probative value); Talley v. State, 160 Fla. 593, 36 So.2d 201 (1948) (same; eight other victims to prove one rape); Johnson v. State, 432 So.2d 583 (Fla. 4th DCA 1983) (no feature merely from volume of testimony); Espey v. State, 407 So.2d 300 (Fla. 4th DCA 1981) (same; score of sexual batteries committed on five other victims to prove one charged crime); Dean v. State, 277 So.2d 13 (Fla. 1973) (same; four other victims to prove one rape charge).
Finally, where the defendant's trial strategy causes the similar fact evidence to outweigh the evidence directly relating to the crime charged, the disparity may be disregarded entirely. In Sias v. State, 416 So.2d 1213 (Fla. 3d DCA 1982), this court rejected the defendant's feature claim, even though more time was spent and evidence presented on the collateral crime than on the charged crime, because the disproportion was caused not by the State going too far, but by the defendant's decision to attack the reliability of the victim's identification and to present an alibi defense to the similar crime. See State v. Maisto, 427 So.2d 1120, 1122 (Fla. 3d DCA 1983) (State not accountable if defendant chooses to dwell on the collateral acts); Blackburn v. State, 314 So.2d 634, 639 (Fla. 4th DCA 1975) (extent of similar fact evidence "grossly aggravated by [defendant's] liberal and extensive cross-examination of the state's witnesses"). See also Medina v. State, 466 So.2d 1046 (Fla. 1985).

II.
We have thus far reviewed the law governing the defendant's contention that the evidence of similar acts of sexual battery on GW and KM denied the defendant a fair trial when it became a feature of his trial on charges of sexual batteries on the two children named in the information, LB and JB. Turning now to the particulars of the present case, we have no difficulty in concluding that the concededly relevant and highly probative similar fact evidence introduced by the State did not become the feature of the trial, and thus the introduction of such evidence did not deny the defendant a fair trial before the properly cautioned jury.

*1387 A.
At the time of the events in question, Janice Snowden, the defendant's wife, was the babysitter for LB and JB. These children, and others, were left regularly at the Snowden home during daytime hours. Janice Snowden frequently placed the children in her husband's care while she ran errands. The defendant, a South Miami police officer, was home in the daytime because he worked the night shift.
LB, six years old at the time of trial, was the only witness competent to testify to the crimes allegedly committed against her and her infant brother. A short time after the incidents which formed the charges, LB was questioned by her parents, extensively interviewed by a psychologist, and physically examined at the Jackson Memorial Hospital Rape Center.[5] Dr. Laurie Braga, the psychologist  whose interview with LB was videotaped  elicited from the young girl that one time when Janice left the house on an errand, Grant came into the bedroom where she and the baby were and turned off the television. Grant took LB's clothes off first and then his own. Grant then touched his penis to her "pee-pee" and her "butt," placed his hand on her pee-pee, and placed his penis in the mouths of her and her brother. The doctor at the Rape Center examined LB and found that she suffered from vaginal redness, odor, and discharge. After observing a slide (wet smear) under a microscope, the doctor diagnosed LB as having gardnerella vaginitis, a sexually transmitted disease rarely found in young children. LB presented no other physical symptoms of having been sexually abused. About a week later, LB told her mother about what Grant had done to her.
During the two years that passed while the case was being readied for trial, LB's parents brought her to the State Attorney's Office about ten times. Sometimes she would talk to an Assistant State Attorney, and sometimes, not wanting to talk, she would just play.
When she was five, LB was interviewed by another doctor, an expert in child development. Although she was visibly uncomfortable with discussing the incident with this doctor, LB used some anatomically correct dolls to illustrate the various sexual acts that she said Grant had performed on her and her brother. To test her ability to discriminate between various facts, thereby testing the accuracy of her previous statements, the doctor asked LB whether Grant had kissed her pee-pee. LB said no.
LB was also deposed by Snowden's attorneys. In the deposition, LB said things she later denied or which were contradicted by her mother. Thus, at her deposition, she testified, inter alia, that she had told her parents immediately that Grant had done something to her, that Grant touched her pee-pee with only his hand and nothing else, and that Grant had only patted her butt.
These and other inconsistencies, as well as LB's numerous trips to the State Attorney's Office and the psychologist's videotaped interview, were to later form the basis for Snowden's contention at trial that LB's accusations were complete fabrications born in the leading questions asked by Dr. Braga and nurtured by the retelling in countless interviews at the State Attorney's Office. LB's vaginitis, argued Snowden, was misdiagnosed as a sexually transmitted disease instead of what it really was, a typical rash and vaginal discharge associated with children not yet toilet trained.

B.
To the State's surprise, LB, age six at the time of trial, was unable to identify the *1388 defendant in court as the man she knew as Grant, whom she said had molested her. To overcome this deficiency and the inconsistencies between LB's trial testimony and her pretrial responses, and to firmly establish that the defendant was the person who had sexually assaulted LB and her brother, the State presented evidence that Snowden had sexually abused two other young children who had also been left in the daytime care of his wife. This evidence, which Snowden strenuously disputed, consisted of the testimony of a five-year-old boy named GW and his parents, a six-year-old girl named KM and her mother, and certain other witnesses who had examined GW and KM for signs of sexual abuse. Neither of these children presented any physical evidence of having been sexually abused, except that GW was tested twice for oral gonorrhea, first yielding a positive and then a negative test result. After receiving penicillin treatment, GW was again tested, yielding a negative test result.
Snowden's response to the similar fact evidence was to attack the credibility of the children, cast doubt on the veracity of the gonorrhea diagnosis, and argue that these children were also mistaken  that they too had been improperly influenced by a host of concerned parents, prosecutors, and doctors. His objections to the similar fact evidence were, as we have said before, limited to the claim that although the testimony of GW and KM was relevant, the testimony of their supporting casts made their similar fact evidence a feature of the trial. Thus, Snowden made "feature" objections to testimony of GW's father about what GW had told him and what the defendant said when GW's parents accused him of having molested GW; testimony of a doctor who examined KM and found no physical evidence of sexual abuse; testimony of Janice Snowden that GW and KM were not "problem" children; and testimony of an HRS microbiologist regarding the accuracy of gonorrhea tests and the likelihood and causes of false negative and false positive test results.
The defendant's case consisted of testimony from a psychologist who testified that he had told GW's father to stop putting pressure on his son to say things he was not ready to say  particularly that the defendant had put his penis in GW's mouth. LB's father testified that his daughter had a history of redness and vaginal itching and had initially denied having been molested by Snowden. The defense also called a pathologist who testified that a year and a half after the alleged incident, Snowden had tested negative for gardnerella and that the culture that was performed would have also revealed the presence of gonorrhea. Another doctor testified that gardnerella vaginitis is often misdiagnosed, albeit in adults, particularly where a wet smear, as here, is used. The defendant also presented evidence that his wife was treated in 1982 for vaginal itching and redness, which was diagnosed as trichomonas. She was tested for gonorrhea and syphilis in 1984, but did not require treatment. Finally, the defendant offered the videotape of the Braga interview to show that LB had been brainwashed.
On the State's rebuttal, Dr. Braga explained the techniques that the jury saw in the videotaped interview of LB and denied having brainwashed LB.
Throughout the trial, the court, the State, and the defense repeatedly reminded the jury of the limited purpose for which the similar fact evidence was being received. In his opening statement, the defendant's attorney cautioned the jury that, although they would be hearing testimony of collateral crimes, they were not being asked to decide the guilt or innocence of Snowden as it related to these other children. Before any testimony relating to the collateral crimes was introduced, and again at the close of the evidence, the court instructed the jury on the limited use of the evidence and that the defendant was not on trial for crimes not charged in the information. Both the State's and the defendant's closing arguments centered on the acts charged in the information and the testimony and credibility of LB. The similar fact evidence was used by the State simply to show the identity of the defendant and to rebut the defense's contention that LB was lying: it was just not possible, the State *1389 argued, to have three children fabricate such identical stories. The defense also repeatedly reminded the jury in closing that the defendant was not on trial for acts that KM and GW testified about and that it would not be fair to convict him based on his bad character.

III.
We are convinced that the similar fact evidence introduced in this case did not become a feature of the trial so as to unfairly prejudice the defendant. First, the jury was appropriately and repeatedly instructed on the proper use of the evidence. See Oats v. State, 446 So.2d 90, 94 (Fla. 1984) (trial court's twice reading cautionary instructions to the jury concerning similar fact evidence "more than corrective" against claim of feature). No argument made by counsel for the State was inconsistent with these instructions, and, indeed, both counsel's arguments reminded the jury that their duty was limited to deciding the narrow question of the defendant's guilt of sexually battering LB and JB. Second, the amount of the similar fact evidence, when compared to the amount of evidence directly relating to the charged crimes, was not excessive.[6] Third, a substantial portion of the similar fact evidence was adduced by the defendant himself, and such imbalance as there may have been is, at least in part, attributable to him. Fourth, in a prosecution such as this which depends almost entirely on the credibility of a very young child, it is often necessary for the State to prove the charges by pieces of evidence other than the child's live testimony. This problem of proof occurs whether the incident to be proved is the charged crime or the similar act that fills in the gap in the State's ability to prove the charged crime. Indeed, the defendant's closing argument recognized the acute difficulty of proving this case. See Bourjaily v. United States, 483 U.S. 171, ___, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144, 155 (1987) ("[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts."). Fifth, as the Florida Supreme Court said recently in Heuring v. State, 513 So.2d 122 (Fla. 1987), there is a need to corroborate the testimony of child victims through the use of similar fact evidence:
"Cases involving sexual battery committed within the familial context present special problems. The victim knows the perpetrator, e.g., a parent, and identity is not an issue. The victim is typically the sole eyewitness and corroborative evidence is scant. Credibility becomes the focal issue. In such cases, some courts have in effect relaxed the strict standard normally applicable to similar fact evidence. These courts have allowed evidence of a parent's sexual battery on another family member as relevant to modus operandi, scheme, plan, or design, even though the distinction between sexual design and sexual disposition is often tenuous. We find that the better approach treats similar fact evidence as simply relevant to corroborate the victim's testimony, and recognizes that in such cases the evidence's probative value outweighs its prejudicial effect."
513 So.2d at 124-25.
*1390 See Beasley v. State, 518 So.2d 917 (Fla. 1988); Calloway v. State, 520 So.2d 665, 667 (Fla. 1st DCA 1988) (testimony of two other girls that they too had been molested by victim's stepfather properly bolstered credibility of victim, which was "the focal issue in the case"); Espey v. State, 407 So.2d 300, 302 (Fla. 4th DCA 1981) ("Where a seven year old child is the only eye witness the jury may well find the testimony incredible, as if coming from a deranged fanciful child unable to perceive the true gravity and dire consequences of her accusations.").

IV.
The similar fact evidence introduced in this case was not a needless attack on the defendant's character. It did not become a feature of the case in any respect, and its introduction did not transcend its relevance. The jury was well and consistently advised about the proper use of the similar fact evidence, thereby minimizing any danger that it might convict the defendant because of uncharged misconduct. Accordingly, the defendant's convictions are
AFFIRMED.
NOTES
[1] In Williams I, the court relied on Talley v. State, 160 Fla. 593, 36 So.2d 201 (1948), which affirmed a rape conviction where five women testified about three prior and two subsequent incidents involving the defendant, all of which bore very similar characteristics. The Talley court held that such evidence was admissible if it cast light upon the character of the act under investigation by showing motive, intent, absence of mistake, common scheme, identity, or general pattern of criminality so that the evidence of the prior crime has a relevant or material bearing on some essential aspect of the offense charged.
[2] The court in Bryan v. State, 533 So.2d at 746, suggests that there are three separate limitations to the rule of relevancy: the "feature" limitation; the prohibition against introducing "evidence solely for the purpose of showing bad character or propensity in which event it would not be relevant"; and the restriction applicable where "probative value is substantially outweighed by undue prejudice." The second of these is a restatement of the rule of relevancy rather than a limitation on it. The "feature" limitation appears to be a specific application of the more general proscription against prejudice outweighing probative value.
[3] In Smith v. State, 344 So.2d 915 (Fla. 1st DCA 1977), disapproved in part, Ruffin v. State, 397 So.2d 277 (Fla. 1981), the court held that although the State was entitled to show what happened to the decedent's body and that the defendant and his wife attempted to conceal the killing, the defendant was deprived of a fair trial by the undue emphasis placed on his efforts to hide the killing. As the court pointed out, the wife's testimony about the killing and the events leading up to it, characterized by the court as being "concise yet descriptive," covered 37 pages. Over 115 pages of the transcript dealt with only the burial and cover-up, which the court described as "an intricately drawn picture of the [defendant's] words and deeds." 344 So.2d at 917. The court then engaged in a balancing test to determine whether the prejudice to the defendant outweighed the probative value of the evidence and concluded that "the inquiry conducted by the state concerning the cover-up transcended the bounds of relevancy and became a feature of the case instead of the crime charged in the indictment." Id. The reversal was not, however, based on volume alone.
[4] It follows, of course, that a relatively small amount of similar fact evidence will not by itself be deemed to infringe upon a defendant's fair trial right. See, e.g., Oats v. State, 446 So.2d 90 (Fla. 1984) (similar fact evidence  five witnesses to rebut defendant's contention that shooting was an accident  not feature where evidence was relatively brief and incidental); Mitchell v. State, 491 So.2d 596 (Fla. 5th DCA 1986) (similar fact evidence  horrid condition of defendant's other nursing homes admitted to show knowledge and absence of mistake in the condition of defendant's Florida nursing home  not feature where there was relatively small amount of such evidence, and manner in which it was presented prevented it from pervading the case); Pickles v. State, 291 So.2d 100 (Fla. 2d DCA 1974) (similar fact evidence not feature where only fleetingly mentioned).
[5] In 1984, after reading in the newspaper about accusations of child sexual abuse levied against Grant Snowden, LB's mother questioned her four-year-old daughter about whether anything bad had happened to her while at the Snowden house. LB said no. In response to another question, LB denied that Grant had touched her private parts. That evening, Mrs. B talked with her husband, and together they questioned LB again. The child again denied that anything had happened, but her manner of answering  LB looked at the floor and made no eye contact  made her parents suspicious. Mr. and Mrs. B were not satisfied with the child's answers and felt that she was not telling the truth. They contacted the State Attorney's Office and were asked to bring LB in for an interview.
[6] The defendant calculates the respective amounts of testimony by erroneously excluding portions of testimony which he describes as "general in nature or which are not uniquely applicable to `charged crimes' or `other crimes.'" These include the qualifications of expert witnesses who testified as to all victims; the testimony of Janice Snowden and Thomas Helms, who both established Janice's babysitting habits; and general testimony relating to laboratory procedures. The defendant argues that these pages are properly discounted "since they apply equally to `charged crimes' and `other crimes.'" In our view, all of this evidence is properly attributed to charged crimes because the State would have introduced it whether or not it introduced the similar fact evidence. Therefore, our calculation, which includes all of the evidence, is not as lopsided towards the collateral crimes as is the defendant's and is more useful in deciding whether sheer volume is an important factor. According to Snowden's calculation, more than two-thirds of the witnesses and one-half of the testimony were devoted to similar fact evidence; according to our calculation, less than one-half of the witnesses and only one-third of the testimony were devoted to similar fact evidence.