741 So.2d 1192 (1999)
Mark DUFFEY, Appellant,
v.
STATE of Florida, Appellee.
No. 98-0552.
District Court of Appeal of Florida, Fourth District.
September 22, 1999.
*1193 Richard L. Jorandby, Public Defender, and Dea Abramschmitt, Special Assistant Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Lara J. Edelstein, Assistant Attorney General, Fort Lauderdale, for appellee.
GROSS, J.
Mark Duffey appeals his convictions of second degree murder and grand theft. We affirm, and write primarily to address Duffey's claim that similar fact evidence of another crime was wrongfully admitted at trial under section 90.404(2), Florida Statutes (1997).
The case began with a missing person investigation regarding Deborah Helenius, who did not show up for work on October 7, 1996. Palm Beach County Sheriff's detectives learned that Helenius had been at the Dark Horse Tavern the night before, with several employees of Clifton Tower Service, including Duffey. The detectives also discovered that Duffey was absent from work from October 7-9, 1996. While on assignment in West Palm Beach, Duffey had been staying at the Days Inn across the street from the Dark Horse Tavern. After Detective Ole Olsen took over the case on October 10, Helenius's car was discovered abandoned in an Orlando parking lot.
Olsen traveled to Orlando and executed a search warrant for Duffey's apartment. The search produced only phone bills showing calls Duffey had made to Orlando from West Palm Beach on the morning of October 7. The next day, Olsen met with Duffey at his apartment. Duffey voluntarily got into the front seat of Olsen's unmarked car to drive to the Orange County Sheriffs Office for questioning. Another detective drove to the station in a separate car.
Duffey told Olsen that he was looking for the wrong man, that he should be looking for a guy who was wearing a ball cap. Olsen responded that he did not want to talk about the case until they arrived at the Sheriff's Office. Nonetheless, Olsen told Duffey that the police knew he had been with Helenius the night she disappeared, that someone had seen *1194 Duffey in her car, and that the police had a tape from a bank security camera which showed him getting out of Helenius's car where it had been abandoned. The story about the videotape was untrue.
Duffey asked Olsen to stop at a convenience store for some cigarettes and something to drink. Before stopping, Olsen told Duffey about one of his previous cases, in which a prostitute was raped and killed, the killer claimed that the killing was accidental and in self defense, and the killer "walked." Olsen hoped that the story would entice Duffey into talking about the case. The suspect went into the store alone, came out with his purchases, and asked if he could smoke in Olsen's car. Duffey told Olsen that he wanted to think a minute and not go to the Sheriff's Office right away, so the two men sat in the parking lot for about twenty minutes.
Duffey asked the detective what would happen if he cooperated with the police. Olsen asked what Duffey meant by "cooperating." Duffey clarified that he wanted to know what would happen if he were to take Olsen to the location of Helenius's body. Olsen responded that he would gather tactical personnel at the Sheriff's Office and go to the body; afterwards, he would interview Duffey at the Sheriff's Office and arrest him for murder. Duffey then said that there had been no premeditation.
Duffey told Olsen that the body was located off Highway 50 near Billow. Olsen secured the help of other officers and drove alone with Duffey from the Sheriff's Office to the site of Helenius's body. On the way, Olsen read Duffey his Miranda rights and Duffey stated that he understood them. Immediately after signing the card, Duffey began to tell Olsen his version of the night of October 6, 1996:
Duffey sat with Helenius at the Dark Horse Tavern. She asked if she could come back to his motel room. Duffey agreed. He went back to his room at the Days Inn at around 2:00 a.m. There, he made a phone call to Orlando. A little while later, Helenius knocked on the door. Duffey let her in. They drank beer, started "messing around," and she performed oral sex on him. Helenius then stopped and demanded that Duffey have intercourse with her. Since he had not climaxed during oral sex, Duffey ejaculated within seconds of starting intercourse. Helenius became angry, yelling and swearing and saying that no one got sexual favors from her for free. She began to hit Duffey in the face and chest and bit his finger. When Helenius continued attacking him, he grabbed her by the neck and pushed her up against the wall, but she kept hitting and kicking him. She suddenly "passed out" and Duffey unsuccessfully tried to resuscitate her.
Realizing that Helenius was dead, Duffey panicked. He thought no one would believe that the killing was accidental because of his prior record. He wrapped the body in a blanket from the motel and put it in the trunk of Helenius's car. He drove to Orlando and dumped the body in a lake in a remote location. He parked Helenius's car in a lot and left the windows down with the keys in the ignition, hoping someone would steal it.
Prior to trial, the state moved to admit similar fact evidence concerning Duffey's prior attacks on two women, Marie Cicocca and Desiree McCutcheon. The court heard the testimony of both women.
Cicocca testified that on June 30, 1984, when she was eighteen, she worked as a chambermaid in the resort town of Wildwood, on the Jersey shore. She accepted a ride home from Duffey, whom she had just met through a friend. At first, Duffey seemed "very charming, very nice, nothing out of the ordinary." Although Duffey may have "had a drink or two," he did not slur his words and did not seem at all drunk.
After she got in the car, Cicocca and Duffey made small talk. She noticed his name on a dog tag hanging from the rear view mirror. Duffey asked Cicocca for a *1195 kiss and she kissed him on the cheek. When he pressed her for more, she kissed him once on the lips. When he wanted to go further, she told him that she was only interested in the ride home and nothing more. She started to get out of the car.
Duffey pulled Cicocca back into the car and forced her to shut the door. He put his hands around her neck. Cicocca described for the court what happened next:
He was crushing my windpipe. I couldn't breathe. I was veryat the time he was telling me he was going to strangle me to death, he was going to kill me and I believed him because of the fact that there was something in his eyes that changed. It was not as if somebody is actually, physically changing... When I said no, something changed and the look in his eyes was a look I had never ever seen before and I will never forget as long as I live.
It's a look somebody said I am going to kill you, they have their hands around your neck, they are not joking no longer.
Cicocca distinguished the situation of merely having to "fend off a guy" from the "look of somebody wanting to kill, that is going to kill you, going to try to." Duffey kept choking Cicocca's windpipe. She could not breathe. She could not talk. She felt that she "was about to die." She bit Duffey on the hand and he said "I am really going to have to kill you." He put his hand underneath the seat and reached for something. Cicocca felt the blunt end of something. It was a nightstick.
At that point, she used her knee to honk the horn. Duffey let go of the nightstick to grab her knee. Cicocca was then able to scream and honk the horn. People came and she got away. Duffey tried to run her over in his car, but someone pulled her out of the way. Cicocca described her injuries in detail. She identified Duffey as her attacker.
Desiree McCutcheon testified about an encounter with Duffey in 1989. They had consensual sex, which was so rough that it scared her. As a result she told Duffey that she wanted to go home instead of to New Jersey with Duffey. He pulled a knife on her in his car, tied her hands, drove her to a remote wooded area, strangled her with a red handkerchief, and anally raped her.
The trial court ruled that Cicocca's testimony was "relevant to the lack of accident, which is the crucial issue in this case." On the remoteness issue, the court found that Cicocca "had an excellent memory for details, that it's all still very vivid in her mind, therefore, it's not too remote." The court excluded McCutcheon's testimony, finding that she was "an admitted liar about details of the case" and that "her memory of past details is extremely poor."
At trial, the medical examiner opined that the cause of Helenius's death was due to manual strangulation. He testified that his examination of the corpse revealed that the hyoid bone, a ushaped bone just below the tongue underneath the Jower jaw, was partially fractured. To the medical examiner, this indicated that "brutal force" had been applied to the victim's neck, since a "considerable amount of violent force" is required to produce such a fracture.
Duffey first challenges the admissibility of his statement to Detective Olsen. Duffey's version of the events surrounding his statement drastically differed from that of the detective. However, the trial court found Olsen's testimony to be the more credible, a finding which we will not disturb. See Franklin v. State, 718 So.2d 902, 904 (Fla. 5th DCA 1998). This court must interpret the evidence and the reasonable inferences to be drawn from the evidence in a manner most favorable to sustaining the trial court's decision to deny the motion to suppress. See State v. Franko, 681 So.2d 834, 835 (Fla. 1st DCA 1996). The state carried its burden of showing that the defendant's statement was freely and voluntarily given. See Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); Voorhees v. State, 699 So.2d 602 (Fla.1997); *1196 Nelson v. State, 688 So.2d 971 (Fla. 4th DCA 1997).
As to the second point on appeal, even assuming that it was error for the medical examiner to opine on whether the death could have been accidental, see generally Fridovich v. State, 489 So.2d 143 (Fla. 4th DCA 1986) (deciding whether exclusion of medical examiner's opinion as to accidental nature of death would be prejudicial error), approved, 562 So.2d 328 (Fla.1990), the trial court sustained the defendant's objections and gave curative instructions. The error, if any, was not prejudicial. See § 924.051(7), Fla. Stat. (1997).
Finally, Duffey challenges the admissibility of Maria Cicocca's testimony at trial. Under section 90.404(2)(a), similar fact evidence of other crimes "is admissible when relevant to prove a material fact in issue, such as ... absence of mistake or accident." See, e.g., Hunter v. State, 660 So.2d 244, 251 (Fla.1995). Duffey's defense at trial was that he accidently choked the victim to death. Duffey's statement to the detective was the only eyewitness account of the murder. The similar crime evidence was relevant to rebut his claim of accident. See Wuornos v. State, 644 So.2d 1000, 1006-07 (Fla.1994).
The defendant attacked Cicocca and Helenius during sexual encounters, one where his advances were rebuffed, the other when Duffey's masculinity was threatened by his premature ejaculation. In both situations, Duffey was embarrassed or frustrated, trying to cope with a woman he could not control. Both women bit Duffey on the hand. Duffey's response in each case was to forcefully grab the women by the throat. He declared his intent to kill Cicocca. She was able to escape by honking the car horn to attract attention. Helenius was alone with Duffey in a motel room with no chance to summon help. Duffey's statements to the living witness, who survived his attack through her resourcefulness, were probative of his state of mind during the attack on the victim who did not survive.
This conclusion is supported by our previous holding that similar fact evidence is admissible if probative of a defendant's mental condition, when that mental condition is material to an issue at trial. In Rossi v. State, 416 So.2d 1166 (Fla. 4th DCA 1982), a defendant charged with kidnapping, sexual battery, and attempted second degree murder contended that his actions were the result of "an isolated and temporary mental breakdown." We held that "the jury was entitled to know that the appellant had engaged in virtually the identical conduct on a prior occasion," because the evidence of the defendant's "mental state during the earlier attack [was] relevant at his trial for the more recent attack." Id. at 1168 (citation omitted); see Gould v. State, 558 So.2d 481, 485 (Fla. 2d DCA 1990), opinion quashed on other grounds, 577 So.2d 1302 (Fla.1991).
The supreme court quoted Rossi with approval in Street v. State, 636 So.2d 1297, 1300 (Fla.1994), a case where the court sustained the admission of another crime to rebut the defense of voluntary intoxication. The defendant in Street was on trial for shooting and killing two police officers after they confronted him about a disturbance at a trailer park. During a struggle, the defendant took one officer's gun and shot them both. The defendant claimed that he was so intoxicated through the use of cocaine that he was unable to form the specific intent to commit first degree murder. On rebuttal, the state called Officer DeCarlo who testified that on another occasion he and a fellow officer attempted to arrest the defendant for disorderly conduct; the defendant resisted and tried to pull DeCarlo's gun out of his holster. DeCarlo was able to hold on to his pistol and the officers subdued the defendant. DeCarlo testified that the defendant was not under the influence of cocaine. The supreme court held that
DeCarlo's testimony of an encounter similar to Street's involvement with the *1197 officers in the instant case was admissible in rebuttal of the contention that [the defendant's] actions were the result of the influence of cocaine.
Id. Just as the aborted attempt at stealing DeCarlo's weapon was probative of the defendant's intent in the completed murders in Street, so was the interrupted attack on Cicocca relevant to Duffey's state of mind in the completed murder of Helenius.
Duffey argues that the 12 year hiatus between the Cicocca attack and the Helenius murder made the evidence of the earlier crime too remote to be admissible. Under section 90.404(2)(a) the remoteness of a prior crime is one aspect of its relevance, its tendency to prove or disprove a material fact in issue. See McGough v. State, 302 So.2d 751, 754 (Fla.1974); Williams v. State, 110 So.2d 654, 662 (Fla. 1959); Griswold v. State, 77 Fla. 505, 82 So. 44, 49 (1919); § 90.401, Fla. Stat. (1997). When faced with the claim that prior crimes are too remote to be relevant, the trial court
must consider not the passage of time alone, but the effect of the passage of time on the evidence. Remoteness in terms of the passage of time precludes the use of evidence that has become unverifiable through loss of memory, unavailability of witnesses and the like.
Heuring v. State, 513 So.2d 122, 123 (Fla. 1987) (quoting Heuring v. State, 495 So.2d 893, 894 (Fla. 1st DCA 1986) vacated on other grounds, 513 So.2d 122 (Fla.1987)). In addition, the trial court should take into account that the "absence of similar conduct for an extensive period of time might suggest that the conduct is no longer characteristic of the defendant." 513 So.2d at 124. The decision on the relevance and admissibility of prior crimes evidence is addressed to the discretion of the trial court. See Griswold, 82 So. at 49; State v. Ayala, 604 So.2d 1275, 1276 (Fla. 4th DCA 1992).
In Rossi, this court approved the admissibility of criminal conduct occurring ten years prior to the crime charged. In a case involving familial sexual abuse, the supreme court held that sexual batteries occurring twenty years before the charged offenses were admissible, where "the passage of time ... did not affect the reliability of the evidence." Heuring, 513 So.2d at 124; see Potts v. State, 427 So.2d 822, 825 (Fla. 2d DCA 1983). On the issue of whether decades old conduct was still probative, the supreme court noted that "the opportunity to sexually batter young children in the familial setting often occurs only generationally." Heuring, 513 So.2d at 124.
The trial court in this case exercised its discretion according to the guidelines specified in Heuring. The court excluded McCutcheon's testimony because it was unreliable, since the witness's memory for details was "extremely poor." The court observed Cicocca's testimony and determined that the passage of time had not compromised the evidence. The witness's testimony was vivid and fact specific; the experience was a defining moment in her life. The evidence concerned an aspect of the defendant's character that he was unlikely to outgrow over time. The trial court did not err in admitting Cicocca's testimony.
AFFIRMED.
KLEIN and HAZOURI, JJ., concur.