863 So.2d 323 (2003)
Kirk Douglas BILLIE, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D01-1303.
District Court of Appeal of Florida, Third District.
July 30, 2003.
Rehearing and Rehearing Denied January 16, 2004.
*324 Bruce Rogow and Beverly A. Pohl, Fort Lauderdale, for Appellant.
Charles J. Crist, Jr., Attorney General, and Michael J. Neimand, Assistant Attorney General; Katherine Fernandez Rundle, State Attorney, and Christine E. Zahralban, Assistant State Attorney, for Appellee.
Before COPE, LEVY, and RAMIREZ, JJ.
Rehearing and Rehearing En Banc Denied January 16, 2004.
PER CURIAM.
Kirk Douglas Billie ("Billie"), a Miccosukee Indian, appeals from two Second Degree Murder convictions, alleging that several evidentiary errors during the trial denied him a fair trial. We agree with Billie and, accordingly, reverse and remand for a new trial.
Billie was charged with two counts of First Degree Murder for the drowning deaths of two of his children, Kurt and Keith Billie. At trial, the jury was presented with evidence that Billie intentionally drove his ex-girlfriend, Sheila Tiger's ("Ms.Tiger"), Chevy Tahoe into a canal while two of their children slept in the backseat. The only dispute at trial concerned Billie's knowledge of the children's presence in the car at the time he drove the car into the canal.
The trial testimony revealed that Ms. Tiger had a habit of driving around the reservation late at night and either leaving the children with her mother, Marie Jim, or taking them with her in the car and letting the children sleep in the backseat. On the evening of the drownings, Ms. Tiger was driving around the reservation with her cousin, Melody Osceola ("Ms.Osceola"), in the passenger seat, the two victims in the backseat sleeping, and the victims' younger sister in the front on Ms. Osceola's lap.
At some point during the night, Billie called Ms. Tiger to inquire about the children's whereabouts and was told that they were with their grandmother, Marie Jim. The testimony discloses that, at approximately one o'clock in the morning, Ms. Tiger went to visit her boyfriend and left Ms. Osceola with the vehicle and the children. *325 Billie subsequently saw the vehicle and followed it to a residence. When Billie approached the vehicle, Ms. Osceola was out of the vehicle, on the passenger side, holding Billie's and Ms. Tiger's youngest child. Billie inquired about Ms. Tiger and was told that her whereabouts were unknown. He then took the vehicle and drove it to a canal where he released it to sink. His two children were in the backseat of the vehicle at the time. As a result, Billie was charged with, among other things, two counts of First Degree Murder.
The State focused its case on the theory that Billie knew the children were in the vehicle when he released it into the canal. To this end, the State offered the testimony of, among others, Sheila Tiger and Captain Pamela Parker ("Captain Parker"). Ms. Tiger testified that while Billie was in the holding cell, she asked him where the truck was. She testified that he was unresponsive, simply asking her why she was running from him. She testified that she subsequently asked him whether he saw the kids back there and he said "yeah." On cross, Ms. Tiger explained that Billie did not show any emotions in his response to her inquiry about the children but, that when he was later told that the children were in the vehicle, he got emotional and cooperated with the investigators to locate the vehicle.
Captain Parker was part of the air rescue team that arrived at the scene to locate the vehicle. Her contact with Billie came during the search and recovery of the vehicle. She testified that when she asked Billie whether he drove the vehicle into the canal with the children he responded: "that's why you're here.... I had an argument with my wife, I made a threat, and I carried it out."
Billie offered his own evidence and testimony to defend his theory of the case, that he did not know the children were in the vehicle when he released it into the canal.
Billie raises three issues on appeal. First, he challenges the admission at trial of Williams[1] Rule testimony. Second, he challenges the admissibility of the expert testimony of the Assistant Medical Examiner to the extent she testified that the type of injuries the victims suffered were of such a nature so as to have awakened them from their sleep. Billie's final issue on appeal challenges the jury view of the crime scene, specifically the vehicle, to the extent that the jury was exposed to several alternative versions of the view. We agree with Billie that some of the Williams Rule evidence was improperly admitted. However, we affirm the trial court's rulings relating to the Medical Examiner's testimony and the alternative views of the lighting inside the vehicle.

I. THE WILLIAMS RULE ISSUE

Prior to trial, the State filed four Notices of Intent to Rely on Williams Rule evidence, contending that the evidence was admissible to show Billie's motive, intent, premeditation, absence of mistake and/or accident, and to dispute Billie's position that he did not know the children were in the backseat. With the first and second Notices of Intent to Rely on Other Crimes, Wrongs, or Acts, the State sought to introduce evidence of Billie's violent tendencies toward Ms. Tiger, including previous threats "to injure or kill," previous instances of hitting, slapping, and kicking Ms. Tiger, an aggravated battery with a broomstick while Ms. Tiger was pregnant, and threats and/or takings of Ms. Tiger's vehicle without her consent. The first Notice also refers to a threat to one of the victims in November of 1994. The third *326 Notice of Intent to Rely on Williams Rule evidence concerns Billie's threats in 1994 and/or 1995 to kill himself and the children he fathered with his ex-wife, Mary Jane, because he was not permitted to see the children. The fourth Notice of Intent to Rely on Williams Rule evidence concerns Billie's comment that Marie Jim, Ms. Tiger's mother, "got what she deserv[ed]" when he beat her after she was awarded custody of his children by the Child Protection Team.
Despite Billie's objections that the information sought to be introduced was irrelevant and/or intended only to establish his propensity for violence and bad character in complete disregard of the Williams Rule criteria and Section 90.404(2), Florida Statutes, the trial court permitted introduction of all of the evidence. Consequently, at trial, the State presented testimony from Ms. Tiger and Rebecca Smith ("Ms.Smith"), a past girlfriend of Billie, regarding the collateral Williams Rule evidence, and introduced additional collateral evidence in response to Billie's testimony.
Ms. Tiger testified that Billie was abusive and violent toward her when he drank. She testified about several specific incidents of abuse, including a time when she was pregnant with the couple's third child and Billie hit her on the stomach repeatedly in front of the children. She also described an incident in November of 1994 where Billie held a hammer over the head of one of the victims, who was sleeping at the time ("hammer incident"). Ms. Tiger admitted that she was scared and that she put herself between the child and the hammer. On cross-examination, Ms. Tiger explained that Billie previously asked her not to take or leave the children with her mother, Marie Jim, because Marie Jim's boyfriend had previously pointed a gun at the children and Ms. Tiger. Ms Tiger explained that Billie's actions were intended to demonstrate how he felt when she left the children at Marie Jim's house with Marie Jim's boyfriend.
Ms. Smith testified that Ms. Tiger told her about the "hammer incident" and that when she confronted Billie about the incident he did not deny that it occurred. She testified that Ms. Tiger probably told her about the incident because Ms. Smith and Billie were seeing each other at the time. Ms. Smith also testified that when Billie was not permitted to see the children that he fathered with his ex-wife, Mary Jane, he told her that if he was not permitted to see the children, he would kill them and himself. During cross-examination, Ms. Smith testified that she did not believe that Billie would act on his thoughts, and that Billie spent a lot of time with his children and treated them kindly.
During Billie's testimony, defense counsel elicited testimony relating to Billie's relationship with his children, more specifically, the victims. Billie testified that he saw his children regularly and that he taught them about the Indian culture. In response, on cross-examination, the State elicited testimony from Billie relating to his abusive relationship with his ex-wife, Mary Jane, and elicited testimony that he previously slapped and threatened the child he fathered with Mary Jane. The State argued, and the trial court agreed, that Billie opened the door to this line of impeachment by suggesting that he was a good father.
After a thorough review of the trial transcript, including closing arguments, the Record on appeal, and relevant case law, we find that the evidence admitted as Williams Rule evidence, with the exception of the testimony relating to the "hammer incident," was improperly admitted.
The test for admissibility of evidence of prior bad acts or other crimes is relevance. See § 90.404(2)(a), Fla. Stat. (1997). However, *327 relevant evidence may be inadmissible where its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence" and where the evidence is submitted to show a defendant's propensity toward commission of the offense or to show a defendant's bad character, with nothing more. See § 90.403, Fla. Stat. (1997); see also Hebel v. State, 765 So.2d 143 (Fla. 2d DCA 2000); Williams v. State, 621 So.2d 413, 414 (Fla.1993); Bryan v. State, 533 So.2d 744 (Fla.1988); Evans v. State, 693 So.2d 1096 (Fla. 3d DCA 1997). Section 90.404(2)(a), Florida Statutes, which codified Williams v. State, 110 So.2d 654 (Fla.1959), provides:
Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
§ 90.404(2)(a), Fla. Stat. (1997).
Thus, similar fact evidence is subject to the basic premise that relevant evidence having probative value in establishing a material issue is admissible except if precluded by a specific rule of exclusion, to, wit: attack a defendant's character or show negative propensities. Similar fact evidence or Williams evidence is generally admissible when relevant to prove a material fact in issue, such as defendant's identity, motive, intent, modus operandi, common scheme or plan, or to prove the absence of mistake or accident. See Zack v. State, 753 So.2d 9, 17 (Fla.2000)(collateral crimes evidence was relevant as part of a prolonged criminal episode demonstrating the defendant's motive, intent, mode of operation, and the entire context from which the murder arose); Pittman v. State, 646 So.2d 167 (Fla.1994)(similar fact evidence is admissible if it is relevant to establish a material issue); Williams v. State, 621 So.2d 413 (Fla.1993)(similar fact evidence relating to sexual assaults on other women was relevant to dispute the defendant's claim of consent where the evidence showed that the assaults occurred in the same general area and where the defendant's scheme and mode of operation were the same in each of the assaults); Townsend v. State, 420 So.2d 615, 617 (Fla. 4th DCA 1982) (evidence of six other homicides and two assaults which the defendant committed were relevant to prove identity and similar mode of operation because the incidents were so similar); Duffey v. State, 741 So.2d 1192, 1196 (Fla. 4th DCA 1999)(evidence that the defendant previously attacked another woman was probative of the defendant's mental condition and rebutted the defendant's accident defense where the prior attacks were almost identical).
This Court has approved the introduction of collateral crimes, or prior bad acts, evidence where the evidence is relevant and intended to show motive, intent or premeditation. See Evans v. State, 693 So.2d 1096 (Fla. 3d DCA 1997); State v. Everette, 532 So.2d 1124 (Fla. 3d DCA 1988); Mayberry v. State, 430 So.2d 908 (Fla. 3d DCA 1982). In Evans, the defendant was charged with the murder of his stepson. The trial court accepted collateral evidence that the defendant beat the victim child for a one-month period immediately preceding the child's death. Additionally, evidence that, a few months prior to the incident, the defendant nearly drowned the child and that the defendant beat the child throughout the year preceding his death was admissible to rebut defendant's claim of mistake or accident. See Evans, 693 So.2d at 1098-99. Similarly, in Brown v. State, 611 So.2d 540 (Fla. *328 3d DCA 1992) this Court affirmed the admission of evidence relating to the "rocky relationship" between the defendant and the victim. Evidence of defendant's jealous threats to kill the victim if he caught her with another man was admissible as evidence of motive, intent and premeditation in the attempted murder case. See Brown, 611 So.2d at 542; see also Lazarowicz v. State, 561 So.2d 392 (Fla. 3d DCA 1990)(evidence of defendant's prior sexual misconduct with the victim/daughter admissible to the issues of motive, intent and modus operandi; to establish the existence of a relationship between the two; and to show that the charged crime was not an isolated incident).
Nevertheless, limitations on the admission of relevant evidence have been established. For example, evidence submitted to show a defendant's propensity toward commission of the offense or to show the defendant's bad character, with nothing more, is inadmissible. See § 90.404(2)(a), Fla. Stat. (1997); Heuring v. State, 513 So.2d 122 (Fla.1987); see also Foburg v. State, 744 So.2d 1175, 1176 (Fla. 2d DCA 1999); Snowden v. State, 537 So.2d 1383 (Fla. 3d DCA 1989); Johnson v. State, 432 So.2d 583 (Fla. 4th DCA 1983). Similarly, where the probative value of the evidence is substantially outweighed by the prejudicial value, the evidence is inadmissible. See Snowden v. State, 537 So.2d 1383 (Fla. 3d DCA 1989); see also Bryan v. State, 533 So.2d 744 (Fla.1988). Moreover, relevant evidence of prior bad acts should not become a feature of the trial.
The Supreme Court of Florida has recognized that
[t]o minimize the risk of a wrongful conviction, the similar fact evidence must meet a strict standard of relevance. The charged and collateral offenses must be not only strikingly similar, but they must also share some unique characteristic or combination of characteristics which sets them apart from other offenses.
Heuring v. State, 513 So.2d 122, 124 (Fla. 1987); see also Robertson v. State, 829 So.2d 901 (Fla.2002). In Heuring, the Court reversed the defendant's conviction for sexual battery of his stepdaughter, finding that the State's attempt to elicit evidence that defendant molested five other children was prejudicial error. The Court noted that, although evidence of the previous molestation of his daughter and stepson was admissible since those cases involved sexual battery committed within the familial context, the alleged molestation of the other five children was not sufficiently similar to the charged offenses to justify its introduction into evidence. See Heuring, 513 So.2d at 125. This Court, in Snowden v. State, 537 So.2d 1383 (Fla. 3d DCA 1989) expressed concern with the potential of convicting a person for his criminal propensities or bad character rather than for the charged crime. See Snowden, 537 So.2d at 1384.
The concern is that "the jury may choose to punish the defendant for the similar rather than the charged act, or the jury may infer that the defendant is an evil person inclined to violate the law."
Snowden, 537 So.2d at 1384 (quoting Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 1499-1500, 99 L.Ed.2d 771, 780 (1988)).
The Supreme Court of Florida recently had the opportunity to review a matter involving the introduction of Williams Rule evidence in Robertson v. State, 829 So.2d 901 (Fla.2002). In Robertson, the Court reaffirmed Heuring, finding that evidence that the defendant had, six years prior, threatened his ex-wife with a rifle was not sufficiently similar to introduce as *329 evidence in the defendant's trial for the murder of his girlfriend utilizing a handgun. See Robertson, 829 So.2d at 909-11. The Court focused on the differences among the crimesspecifically, the prior act was a threat while the current charge was the completed act of murder; and the defendant used a rifle in the prior act, but used a handgun in the current charge. The Court specifically noted that the cases regarding admissible Williams Rule evidence "involve[] either prior crimes against the same victim as the charged offense, or the charged offenses and the prior offences involve[] similar completed crimes of violence." Robertson, 829 So.2d at 910 (citations omitted).
In light of long-standing Florida law, and the Supreme Court of Florida's reaffirmation in Robertson, the items of collateral evidence introduced in the instant case, with the exception of the "hammer incident," are not sufficiently similar to justify or support their admission at Billie's trial for the drowning deaths of the two victims. To begin with, none of the "other" Williams Rule evidence is relevant to an issue of material fact. Additionally, none of the evidence is relevant to show Billie's motive, intent, modus operandi, a common scheme, nor the absence of mistake or accident. Moreover, the prejudicial effect of the improper Williams Rule evidence greatly outweighs any probative value the evidence may have. With respect to the "hammer incident," the matter is relevant to the extent that the threat was directed at one of the victims and, as a result, (1) raises a jury issue as to what Billie intended by his actions, and (2) relates to a primary issue in case, to-wit: Billie's capacity for inflicting harm on his children. Thus, the collateral evidence, except the "hammer incident" evidence, should not have been admissible.

A. PRIOR BAD ACTS RELATING TO DEFENDANT'S VIOLENT TENDENCIES

A series of items of evidence relating to Billie's violent temperament was elicited during the State's case-in-chief and closing arguments, including testimony that he hit Ms. Tiger with a broomstick when she was pregnant with their child, that he hit another ex-girlfriend with a bat after he learned that she obtained a restraining order, and that he slapped another woman across the face.
This evidence shows nothing more than Billie's bad temper and controlling personality in his relationships with women. The evidence of prior bad acts relating to Billie's bad temperament toward his girlfriends, as elicited by the State, is irrelevant to the issue of whether he knew that his children were in the back of the truck when he let it go into the canal. See Robertson, 829 So.2d at 909-11; Heuring v. State, 513 So.2d at 124; Snowden, 537 So.2d at 1384. As such, the evidence shows nothing more than the fact that Billie is capable of putting the Tahoe into the canal in an attempt to exert control over his ex-girlfriend. The Record is clear, and Billie does not dispute the fact, that he took the truck and put it in the canal. Rather, he only claims that he did not know that his children were in the truck at the time. Consequently, the introduction of these prior bad acts was erroneous and served only to show Billie's propensity for violence and/or bad character.

B. PRIOR "THOUGHTS" TO KILL CHILDREN FROM PREVIOUS RELATIONSHIP

The State also elicited testimony from Smith regarding an occasion where Billie stated that he would kill himself and his children from another relationship if he *330 was prohibited from seeing the children. The State sought to show that Billie had the necessary intent and motive to kill his children in the instant case because he had, on another occasion, thought about killing his other children. Again, this evidence does not meet the strict Williams Rule criteria that the collateral evidence must be strikingly similar to the charged crime and possess unique characteristics to the crime for which Billie is currently being tried. See Heuring, 513 So.2d at 124; see also Robertson, 829 So.2d at 909-10.
The circumstances leading up to Billie's statements and thoughts that he would take his life and the lives of his children presented a much different scenario than the situation which led to the deaths of the victims, Kurt and Keith. To begin with, the statement to Ms. Smith was made after Billie's ex-wife obtained a restraining order against him which prohibited him from coming to his ex-wife's home and seeing the children. In the instant case, there was no evidence that Billie was prohibited from seeing his children. In fact, the Record reflects that he spent a substantial amount of time with his children.[2]
Moreover, the evidence elicited from Rebecca Smith, who was dating Billie at the time the statement was made, relates to an event that occurred three or four years prior to the charged offense, and serves no purpose except to bolster the State's propensity case against Billie. Additionally, there is no evidence that Billie acted on the "threat" in any manner. As in Robertson, the evidence involved different crimes and different victims. There is nothing in the Record to connect one with the other. Again, the questions surrounding this evidence and testimony appear to have no purpose except to show Billie's propensity to be impetuous and controlling. This evidence was also improperly admitted and, independent of the previously discussed evidence, would also require reversal.

C. "HAMMER INCIDENT"

The "hammer incident" presents the most similar prior bad act which, in light of the State's position and the fact that the potential threat involved one of the victims, was properly admitted. The State elicited the "hammer incident" testimony in an attempt to show intent, or absence of mistake, i.e., that Billie was capable of committing murder against his children where he previously threatened one of them with a hammer. The defense argument is that the matter was taken out of context. To this end, Ms. Tiger testified that the "hammer incident" occurred during an argument between Billie and Ms. Tiger concerning the fact that Ms. Tiger had previously promised Billie that she would not leave the children at her mother's house because of Billie's concern that the children would suffer physical harm from Marie Jim's boyfriend. Ms. Tiger explained during her testimony that Billie previously asked that she not take or leave the children with her mother because Marie Jim's boyfriend had, in a previous instance, pointed a gun at the children and Ms. Tiger. She explained that Billie was yelling at her for having broken her promise and having left the children with her mother and Marie Jim's boyfriend. Ms. Tiger admitted that she was scared and that she put herself between the child and the hammer but, on cross-examination, explained that Billie's actions were intended *331 to illustrate his own fear and concerns when the children were at Marie Jim's house, and not to threaten the child. Because the circumstances surrounding the "hammer incident" involve a threat against one of the victims, we find the evidence relevant to prove a material fact in issue, i.e., intent and absence of mistake or accident. Duffey v. State, 741 So.2d 1192, 1196 (Fla. 4th DCA 1999). See also Pittman v. State, 646 So.2d 167 (Fla.1994). Accordingly, we find no error in the introduction of evidence relating to the "hammer incident". The evidence of that event, and the determination of what, if anything, it proved, presented a question of fact for the jury's consideration.
In sum, the prior bad act evidence submitted in the instant case, with the exception of the "hammer incident," was not relevant to prove a material issue. See § 90.402, Fla. Stat.; § 90.404(2)(a), Fla. Stat.; Robertson, 829 So.2d at 909-11; Heuring v. State, 513 So.2d 122, 124 (Fla. 1987); Snowden, 537 So.2d at 1384. First, in the instant case, the alleged prior bad acts were nothing more than illustrations of Billie's bad temper and need to control the women in his relationships. Cf. Schwab v. State, 636 So.2d 3 (Fla.1994); Williams v. State, 621 So.2d 413 (Fla. 1993); Duffey v. State, 741 So.2d 1192 (Fla. 4th DCA 1999); Brown v. State, 611 So.2d 540 (Fla. 3d DCA 1992); Townsend v. State, 420 So.2d 615 (Fla. 4th DCA 1982). Additionally, the evidence does not suggest that these acts were part of an ongoing scheme or part of a prolonged criminal episode. Cf. Damren v. State, 696 So.2d 709 (Fla.1997); Bryan v. State, 533 So.2d 744 (Fla.1988).
Contrary to the State's suggestion, the defense did not open the door for the introduction of the collateral evidence. See Robertson v. State, 829 So.2d at 911-13; Rodriguez v. State, 753 So.2d 29 (Fla. 2000) (collateral crimes evidence is admissible where the defendant opened the door by attempting to show that the witness disliked him in order to show the witness' bias against the defendant); Tompkins v. State, 502 So.2d 415, 419 (Fla.1986); Simmons v. State, 790 So.2d 1177 (Fla. 3d DCA 2001)(admission of the defendant's prior aggressions with another victim was permissible after the defendant opened the door during his direct and cross examinations, suggesting that he was the peaceful victim and that he had never been violent with the victim or anyone else.); Allred v. State, 642 So.2d 650 (Fla. 1st DCA 1994)(the defendant claimed a lack of violent propensity); see also Dennis v. State, 817 So.2d 741, 753 (Fla.2002); Williams v. State, 621 So.2d 413 (Fla.1993); Duffey v. State, 741 So.2d 1192 (Fla. 4th DCA 1999); Bozeman v. State, 698 So.2d 629, 631 (Fla. 4th DCA 1997)(concept of opening the door is "based on consideration of fairness and the truth-seeking function of a trial."). The State suggests that Billie placed his character at issue by suggesting that he was a good father. However, the Record is clear that the State elicited testimony regarding the prior bad acts from Ms. Tiger and Ms. Smith during its case-in-chief. On cross-examination, Billie simply rebutted the State's claim. See Robertson, 829 So.2d at 911-12; Bozeman v. State, 698 So.2d 629, 630 (Fla. 4th DCA 1997) ("To open the door to evidence of prior bad acts, the defense must first offer misleading testimony or make a specific factual assertion which the state has the right to correct so that the jury will not be misled.")(emphasis added). Cf. § 90.404(1)(a) & (c), Fla. Stat.; § 90.608(5), Fla. Stat.
Billie also claims on appeal that the State made the prior "bad acts" a feature of the trial. We agree. In Bush v. State, 690 So.2d 670 (Fla. 1st DCA 1997), the Court explained that admission of excessive evidence of other crimes is fundamental *332 error to the extent that it becomes a feature of the trial. In the instant case, Billie was prejudiced by this error. A lot of focus was placed at trial on Billie's violent and controlling character. Billie admitted and does not dispute that he released the truck into the canal. It is undisputed that the children were in the truck and died as a result. The only issue at trial was whether Billie knew his children were in the car at the time the truck was released into the canal. Thus, the witnesses', especially Billie's, character and credibility played a crucial role in the trial. Consequently, introduction of the Williams evidence in the instant matter was error and highly prejudicial to Billie's case. Moreover, the State compounded the error by making the prior bad acts the feature of closing arguments and, therefore, the feature of its case.
In sum, we find that, with the exception of the "hammer incident," the Williams Rule evidence introduced in the instant case was irrelevant and served only to show Billie's bad character and propensity for violence. Unlike permissible Williams Rule evidence, the evidence in the instant case was not elicited to show an ongoing criminal activity or to show a common scheme, plan or intent. Moreover, contrary to the State's argument, Billie did not open the door to character evidence. The prejudicial effect of this evidence clearly outweighs any probative value the evidence may have and, furthermore, Billie objected to the presentation of the evidence both during pretrial hearings on the State's Notices of Intent to Rely on Williams Rule evidence and at trial during the testimony of Ms. Tiger and Ms. Smith. It is clear from the Record that defense counsel's objections were related to the introduction of the improper Williams Rule evidence. Accordingly, we reverse Billie's convictions for Second Degree Murder on the ground that the trial court admitted improper Williams Rule evidence, and remand for a new trial.

II. MEDICAL EXAMINER'S EXPERT TESTIMONY

Billie next challenges the admission of testimony from Dr. Emma Lew, an Assistant Medical Examiner, who testified regarding the autopsy reports.[3] Over defense objection, the Medical Examiner testified that, given the angle of entry of the vehicle into the water, the children would have slid off the seat and onto the floor. The children showed evidence of fresh minor cuts and bruises. It was the opinion of the Medical Examiner that sliding off the seats, the cuts and bruises, or both, would likely have awakened the children.
In Terry v. State, 668 So.2d 954, 960 (Fla.1996), the Supreme Court noted that "[t]he determination of a witness's qualifications to express an expert opinion is peculiarly within the discretion of the trial judge whose decision will not be reversed absent a clear showing of error." Id. We find that the trial court did not abuse its discretion in allowing the Medical Examiner, a medical doctor, to testify that, based on the nature and severity of the scratches and other injuries on the children, the children would have awakened and yelled as a result of the impact of the car hitting the water and the injuries caused by that impact. We find that the testimony is within the expertise of a medical doctor and, therefore, there was no error as to this issue.

*333 III. JURY VIEW

As a third issue, Billie raises concerns regarding the alternative scenarios of the crime scene given at the jury view. The parties in the instant case stipulated to a view of the scene for purposes of appreciating the darkness in the vehicle on the evening in question. The jury was taken to the area of the canal where the drownings took place and were presented with a substantially similar vehicle to the one in which the victims drowned. Each jury member was then given an opportunity to stand by the driver side door as Billie would have done as he let the vehicle go into the canal. The dispute arises with respect to the State's request, and the trial court's permission, to have three different scenarios of the truck's lighting at the view. The first, with the headlights and dash lights on, but no other lights. The second, with the dash lights, headlights, and door courtesy lights on, but no dome lights. The third, with the dash lights, the headlights, the door courtesy lights, and the dome lights on.
Billie argues on appeal that the trial court erroneously permitted the three alternative scenarios in violation of Section 918.05, Florida Statutes, because the evidence did not support the three views and because the lighting evidence was disputed. The State contends that its expert testified that the lights "flickered," when a new battery was installed in Sheila Tiger's vehicle after it was pulled out of the canal, thereby suggesting that the lights were working, and, therefore, the issue of whether the lights were working on the night in question was a factual issue for the jury. We agree with the State on this point.
The Record reflects that Billie and Ms. Tiger testified that the only lights working on the night of the incident were the headlights and the dashboard lights. Ms. Tiger testified that the interior lights went out some weeks prior to the incident. Billie testified that only the headlights and dashboard lights were functioning on the evening he released the vehicle into the canal. The State, however, without objection from the defense, presented the testimony of a Miami-Dade County homicide detective who testified that after the truck was taken out of the canal, a new battery was put in and all the lights in the truck "flickered." From this evidence, the officer concluded that the flickering lights indicated that the interior lights were working at the time of the incident in question, which is contrary to the defense theory that the interior lights were not working at the time of the incident.
A jury view is intended to assist the jury in understanding and applying the evidence presented at trial. See McCollum v. State, 74 So.2d 74 (Fla.1954); Washington v. State, 86 Fla. 533, 98 So. 605 (1923). Section 918.05, Florida Statutes, permits a view of the crime scene by the jury where the trial court determines that the demonstration will be beneficial to the case. However, cases utilizing this procedure have consistently pointed out that no evidence may be taken at the view. See McCollum v. State, 74 So.2d 74 (Fla.1954). Upon thorough review of the Record, we find there was no error in admitting all three scenarios into evidence. The State submitted, without objection from the defense, the testimony of its investigator whose testimony is consistent with the lights working. The defense submitted testimony that the interior lights were not working. Consequently, we find there was no error in admitting all three scenarios into evidence where the evidence supports the alternative theories.
In view of the foregoing, defendant's convictions are reversed and the matter *334 remanded for a new trial consistent with this Court's opinion.
Reversed in part; affirmed in part; and remanded with directions.
LEVY and RAMIREZ, JJ., concur.
COPE, J., (concurring).
I write separately to comment about point III, the jury view. One of the scenarios which was presented to the jury was one in which the dome light was operational. I have some discomfort about whether that scenario rests on a sound scientific basis.
After the vehicle, a Chevrolet Tahoe, was pulled out of the water, it was towed to a police facility. The vehicle battery was dead, presumably as a result of being submerged.
Homicide detective Gene Surman used jumper cables to connect a live battery to the dead battery in the Chevrolet Tahoe. When the detective did this, all of the vehicle lights flickered, including the dome light.
On the basis of this experiment, the prosecution argued that the dome light on the Chevrolet Tahoe was operational prior to its entry into the canal. The defendant and Ms. Tiger had both testified that the dome light did not work.
The question in my mind is whether the detective's testimony rests on a sound scientific basis. The issue is whether the presence of water in the electrical connection would cause the flickering effect the detective described, even if the dome light had not previously been working.
At the trial level, the defense did not raise an objection to the scientific basis for the detective's testimony. Thus, the trial court was entirely correct in admitting the detective's testimony and this testimony sufficiently supported one of the three scenarios, namely that the dome light was working.
My point is that if the detective's testimony rests on a faulty scientific basis, nothing prevents the defense from raising this issue for a determination prior to the retrial.
NOTES
[1] Williams v. State, 110 So.2d 654 (Fla. 1959) codified as § 90.404, Fla.Stat.
[2] There is some evidence in the Record that Billie asked that the children be brought to him on the night of the drownings. However, there is nothing in the Record that supports a theory that he was, as on the previous occasion with his other children, prohibited, permanently nor temporarily, from seeing his children.
[3] The witness did not perform the autopsies of the children. The Medical Examiner who performed the autopsies and wrote the report is no longer with the Medical Examiner's office in Dade County.