693 So.2d 1096 (1997)
Walter Lee EVANS, Appellant,
v.
The STATE of Florida, Appellee.
No. 96-726.
District Court of Appeal of Florida, Third District.
May 21, 1997.
*1097 Bennett H. Brummer, Public Defender and Marti Rothenberg, Assistant Public Defender, for appellant.
Robert A. Butterworth, Attorney General and Sandra S. Jaggard, Assistant Attorney General, for appellee.
Before JORGENSON, FLETCHER and SORONDO, JJ.
SORONDO, Judge.
Walter Lee Evans, the defendant, appeals his convictions and sentences for the crimes of first degree murder and aggravated child abuse.
Our analysis begins with a recitation of the facts which led to the tragic and torturous death of 4 year old Tommie Bush, Jr. On October 28, 1993, Tommie urinated in his clothing because the defendant was using the only available toilet in the house. When the defendant exited the bathroom and discovered that the boy had soiled himself he beat him. Three days later, on October 31, the defendant again beat the boy with a belt, a shoe and his hands when he was told by a relative that Tommie had threatened to tell his natural father about the beatings. Later that evening Tommie went "trick or treating" with his sisters. Upon their return to the house the defendant again beat Tommie.
On November 2, one of Tommie's sisters awoke and discovered that Tommie had vomited. She helped him clean up and went to school. At approximately 10:30 a.m. the defendant tried to wake Tommie but the boy would not awaken. During this process Tommie began to cough up blood and shortly thereafter stopped breathing. The defendant tried to resuscitate the boy while a friend called fire rescue.
Tommie died before the paramedics arrived. His jaw was deformed and discolored, his ribs and chest were discolored and his abdomen was fully distended and rigid. He had scratches on the back of his head and on his right arm. Before moving the body the police called a forensic pathologist to the scene. The doctor concluded that the injuries were consistent with a beating.
After clearing the scene, a homicide detective transported the defendant and other members of the household to the police station. At the station the defendant was read his rights, which he waived. During the interrogation that followed the defendant admitted striking Tommie on the back during the week before he died. He also acknowledged the October 28 and October 31 beatings, and noted that Tommie had been vomiting dark colored substances for 2 days prior to his death and had complained of a stomachache on Halloween. The defendant further stated that he had beaten Tommie 2 times per week during the year before his death and that Tommie's mother had warned him not to hit the boy so hard on several *1098 occasions. After this statement the defendant was allowed to return home.
The medical examiner performed an autopsy on Tommie's body. The external examination revealed that he had contusions on his head above the bridge of the nose, on the left forehead, around the right eye, and across the bridge of the nose and both jaws. Both lips were split and there was an abrasion on the back of his head. There were 2 bruises on his chest (both inconsistent with CPR), both arms were bruised and scratched and his buttocks and legs were scarred by injuries which were consistent with being hit with the edge of the buckle of the defendant's belt. Additionally, Tommie had 4 bruises in his right groin and a scratch in the left groin. He had an old scar on his back and extensive bruising. The sides of his abdomen and chest were also bruised. All but one of the injuries were consistent with having occurred within the last few days of Tommie's life. The injuries were consistent with beatings and inconsistent with an accident.
The internal examination revealed bruising to the brain. Eight of his ribs were fractured and there was an old fracture to another rib. The new fractures were consistent with a blow to the back. Tommie's spleen was bruised and his liver was ruptured. The liver injury, the cause of his death, was consistent with being caused by blunt force trauma to his back occurring no more than 24 hours before death.
After receiving the autopsy report, the lead detective re-initiated contact with the defendant. He asked for and received the belt with which the defendant had beaten Tommie. The defendant then accompanied the detective back to the police station and, after being re-advised of his rights, detailed the viciousness of the October 28 beating. At that time the defendant was placed under arrest for the murder of Tommie Bush.
Evans was charged with first degree premeditated and/or felony murder while engaged in aggravated child abuse between October 27 and November 3, 1993, and aggravated child abuse by committing an aggravated battery or maliciously punishing Tommie between October 23 and November 3, 1993. Before trial, the State filed a notice of intent to rely on evidence of other crimes, seeking to introduce evidence that Evans: 1) nearly drowned Tommie, either recklessly or intentionally, on August 22, 1993, and 2) beat Tommie on numerous occasions during the year prior to his death.
Evans filed objections, contending that the drowning incident was not sufficiently similar and was irrelevant and that the beating allegation was not sufficiently pled. The State filed another notice of intent to rely on evidence of other crimes, alleging that between November 1, 1992 and November 2, 1993, Evans committed child abuse and/or aggravated child abuse on Tommie. At the hearing on the issue of collateral crimes, the trial court ruled the evidence was admissible to establish criminal intent and absence of mistake or accident.
The State presented 3 witnesses to testify about the near-drowning incident: Rachelle Warlick, a nurse at Parkway Regional Medical Center, testified that Evans told her he was trying to teach Tommie to swim by dunking him up and down in the water, that Tommie kept swallowing water, and that Tommie "was going to do it until he got it right." Officer Edward Vandamas, who responded to the near-drowning incident August 22, 1993, testified that he spoke with a man named Walter Evans who told him that he had his son in the pool, he was teaching him how to hold his breath underwater, he was picking the child up and dunking him in the water, and he was holding him there for a lengthy time. Dorothy Whitby, a 9-yearold relative of Evans who lived in the same apartment as Evans and Tommie, testified that it did not look like Evans was teaching Tommie to swim, but that it looked like Evans "was being mean."
Two of the State's witnesses testified about the crime charged in the indictment. One of them, Detective Chris Dangler, testified that Evans said he hit Tommie 15-25 times in the past year.
After the State rested, Evans moved for judgment of acquittal on both counts. The State conceded that it had not proved premeditated murder. The court granted the *1099 motion as to premeditated first degree murder, allowing the case to go forward only on the felony murder theory, but denied the motion in all other regards.
Evans presented the testimony of several witnesses. Helen Brown and Michelle Polk, relatives who lived in the apartment with Evans and Tommie, described how Evans tried to revive Tommie with CPR and cried after he learned Tommie had died. Michelle Polk, Tommie's neighbors Shamis and Angriss Grant, and Tommie's sister Tomika described how Tommie had been knocked down and hurt in his chest by some big boys playing football the week before Tommie's death. Evans also presented the testimony of Dr. John Marraccini, a medical examiner consultant, who testified the injuries were consistent with Tommie falling out of the top bunk bed onto a hard object and consistent with a bigger, older child jumping on top of Tommie and that there were numerous ways in which this type of injury could occur. On cross-examination, Dr. Marraccini agreed that some of Tommie's injuries were the result of aggravated child abuse. He further stated that the injuries appeared to be intentional and not accidental. Finally, he conceded that the injuries did not result from a fall off the bunk bed or during a football game.
During its initial closing, the State commented on the near-drowning incident and on Evans' confession to the year-long beatings. During the jury instructions, the trial court instructed the jury on the appropriate use of collateral crimes evidence. Evans did not object to the instructions. After the jury retired to deliberate, Evans moved for a mistrial, claiming that the collateral crimes evidence became a feature of the State's closing arguments. The trial court denied the motion, finding that the collateral crimes evidence was only 1 of 9 subjects discussed in the State's argument and was not a feature.
The jury returned verdicts of guilty as charged on both counts, and the judge adjudicated Evans guilty in accordance with the verdicts. The State requested an upward departure sentence to the statutory maximum for the charge of aggravated child abuse because of the unscoreable nature of the capital murder charge. The judge sentenced Evans to life imprisonment with a 25year minimum mandatory provision for the murder and 15 years for the aggravated child abuse to be served consecutively to the first sentence. The sentencing guidelines score sheet indicated a recommended sentence of 7 to 9 years imprisonment and a permitted sentence of 5½ to 12 years imprisonment. The written score sheet lists as a reason for departure "unscoreable 1 deg murder," but was not signed by the trial judge. This appeal followed.
As concerns the trial of this case the defendant argues that the trial court erred by admitting the collateral crimes evidence that the defendant nearly drowned Tommie 2 months earlier and that he had beaten Tommie during the course of the previous year. These events, the defendant suggests, were too remote in time to be relevant. He further argues that these prior instances of misconduct were insufficiently similar to the charged offenses to satisfy the requirements of § 90.404(2)(a), Florida Statutes, referred to here as the Williams rule. Finally, the defendant argues that the Williams rule evidence became a feature of his trial.
The defendant's suggestion that the collateral crimes introduced by the state were too remote in time to be relevant is incorrect. Townsend v. State, 420 So.2d 615 (Fla. 4th DCA 1982), rev. denied, 430 So.2d 452 (Fla.1983)(collateral crimes admissible where they were committed 5 to 6 years after the charged offenses); Watkins v. State, 363 So.2d 575 (Fla. 3d DCA 1978) (allowed evidence of collateral crimes committed 6 years before charged offenses); State v. Statewright, 300 So.2d 674 (Fla.1974) (allowed collateral crimes committed 5 years before the charged offense); Crosby v. State, 237 So.2d 286 (Fla. 2d DCA 1970) (allowed testimony regarding similar offenses occurring 4 years prior to the offense charged). In the present case, the "drowning incident" occurred 2 months before the homicide in question and the most remote of the beatings occurred within one year. These events were well within the acceptable time frame set forth by Florida law. Additionally, a careful review of the record convinces us that *1100 the Williams rule evidence did not become the feature of the trial.
Next, the defendant suggests that the collateral crimes introduced by the state were not sufficiently similar to be admissible under the caselaw interpreting § 90.404(2)(a). The rule reads as follows:
(2) Other crimes, wrongs, or acts.
(a) Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but is inadmissible when the evidence is relevant solely to prove bad character or propensity.
The most common characteristic of this type of evidence, and the one which causes the most confusion, is the "similarity" requirement of the rule. In the seminal case of Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959), the Supreme Court of Florida stated:
Our view of the proper rule simply is that relevant evidence will not be excluded merely because it relates to similar facts which point to the commission of a separate crime. The test of admissibility is relevancy.
Id. at 659 (emphasis in original).
As concerns the similarity requirement, in Williams v. State, 621 So.2d 413 (Fla.1993), the Supreme Court of Florida explained that:
As a general rule, such evidence is admissible if it casts light on a material fact in issue other than the defendant's bad character or propensity.... Evidence of other crimes or acts may be admissible if, because of its similarity to the charged crime, it is relevant to prove a material fact in issue. But it may also be admissible, even if not similar, if it is probative of a material fact in issue. Although similarity is not a requirement for admission of other crime evidence, when the fact to be proven is, for example, identity or common plan or scheme it is generally the similarity between the charged offense and the other crime or act that gives the evidence probative value. Thus, evidence of other crimes, whether factually similar or dissimilar to the charged crime, is admissible if the evidence is relevant to prove a matter of consequence other than bad character or propensity.
Id., at 414 (emphasis added). This language would appear to open the door to the admissibility of all collateral crimes evidence regardless of similarity. A review of Florida case law, however, suggests that where Williams rule evidence is offered to prove identity by modus operandi or common plan or scheme, the proponent of the evidence must establish not only a high level of similarity but also uniqueness in nature. Drake v. State, 400 So.2d 1217 (Fla.1981), appeal after remand, 441 So.2d 1079 (1983), cert. denied, 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 832 (1984).[1]
Likewise, where Williams rule evidence is sought to be introduced to corroborate a child victim's accusation of sexual assault within a familial context, there is a similarity *1101 requirement albeit one that is not as rigorous as that necessary for proof of identity by modus operandi. Saffor v. State, 660 So.2d 668 (Fla.1995); Feller v. State, 637 So.2d 911 (Fla.1994); Heuring v. State, 513 So.2d 122 (Fla.1987).
Where evidence of collateral crimes is offered to prove motive there is no similarity requirement. Finney v. State, 660 So.2d 674, 681-682 (Fla.1995).
Where evidence of collateral crimes is introduced to prove knowledge some cases suggest that factual similarity is required,[2] some suggest the opposite.[3]
The law concerning the introduction of collateral crimes for the purpose of proving intent is also somewhat inconsistent as concerns the factual similarity requirement. A review of the applicable case law reveals that in many cases where the state seeks to prove intent through "other" crimes evidence, it also seeks to prove motive through the same evidence. Because the law is clear that there is no similarity requirement to prove motive, Finney, supra, these cases are unreliable for purposes of gauging whether factual similarity is necessary to prove intent. Even when one excludes cases where the evidence is intended to prove both intent and motive, the law is less than clear on this issue.
Because of the vast number of cases dealing with evidence of collateral crimes introduced to prove intent, we limit our analysis to those situations where the proponent of collateral crimes evidence seeks to introduce prior instances of physical child abuse in order to prove intent and/or absence of mistake or accident in a case where the defendant is charged with physically abusing a child. We now review the law in this specific area.
In Pausch v. State, 596 So.2d 1216 (Fla. 2d DCA 1992), the defendant was convicted of the second degree murder of her son. At trial, the state introduced evidence that upon arriving at the hospital the child appeared undernourished and that on occasion, the defendant had used excessive force to discipline him. The Second District Court of Appeal held that the evidence was admissible because it was relevant to prove that the injuries to the child were intentional.
In Worden v. State, 603 So.2d 581 (Fla. 2d DCA), rev. denied, 603 So.2d 581 (Fla. 2d DCA 1992), the defendant was convicted of first degree murder and aggravated child abuse. At trial the state was allowed to introduce evidence of defendant's prior abuse of the victim. The defendant argued on appeal that such evidence should not have been allowed as it was not probative because on those previous occasions the victim had received no head injuries such as those which *1102 caused the child's death in the subject case. The appellate court affirmed the conviction holding that the prior abuse was relevant to show absence of mistake because the appellant argued at trial that the child's injuries were the result of an accidental fall.
Finally, in State v. Everette, 532 So.2d 1124 (Fla. 3d DCA 1988) and Mayberry v. State, 430 So.2d 908 (Fla. 3d DCA 1982), we held that in a child abuse case, reference to prior injuries to the child should be permitted to establish intent and absence of mistake or accident. In Everette, Judge Daniel S. Pearson said in his concurring opinion:
[T]he appellant contends that there was nothing about the prior instances of child abuse that was so similar to the instance of abuse that resulted in the child's death as to establish a modus operandi or signature crime.... That the abuse is not identical or even done under the same circumstances or in the same manner is of no moment where the identity of the abuser, as here, is not in issue. Everette's anticipated defense, gleaned from her statements to the police, is that the prior incidents occurred by accident or mistake, ... Surely a continuous series of such "accidents" is highly relevant to proving that what happened here was no accident.
532 So.2d at 1124-1125. In the present case the defense was that Tommie either accidentally fell off his bunk bed or suffered the injuries in question during a football game. The prior instances of physical abuse were significant, relevant and properly admitted to prove intent and the absence of mistake or accident. Even if this were not the defense, the defendant's prior physical abuse of the child would still be relevant for the same purposes. In Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), the Supreme Court of the United States held that evidence of prior instances of child abuse was admissible regardless of the fact that the defendant made no claim of accidental death of the child victim. The Court stated:
The Court of Appeal ... ruled that the evidence should have been excluded because McGuire did not raise the defense of accidental death at trial. But the prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense.... The evidence... was relevant to show intent, and nothing in the Due Process Clause of the Fourteenth Amendment requires the state to refrain from introducing relevant evidence simply because the defense chooses not to contest the point.
Id., 502 U.S. at 69-70, 112 S.Ct. at 481. We adopt the sound reasoning of the United States Supreme Court on this issue.
To summarize, we hold that in a case charging the accused with the physical abuse of a child, where the state seeks to present evidence of prior physical abuse committed by the defendant upon the same child for the purpose of proving intent and/or absence of mistake or accident, there is no need for factual similarity between the charged offense and the prior abusive conduct beyond the existence of physical abuse in all instances.
As concerns his sentence on Count 2 of the indictment, aggravated child abuse, the defendant argues that the court improperly departed upwards from the recommended sentencing guidelines because she failed to file written reasons for the departure. We find this argument to be meritorious. The trial judge sentenced the defendant to the statutory maximum of 15 years in state prison to run consecutively to the sentence of life imprisonment without possibility of parole for 25 years she imposed on count 1 of the indictment. Although there is an order of departure in the record, that order is not signed by the trial judge.
We affirm the defendant's convictions on both counts of the indictment. We vacate the sentence in count 2 and remand for resentencing. Because it is clear that it was the intention of the trial judge to sentence the defendant to the maximum sentence permitted by law, we remand with directions to sentence the defendant to the maximum sentence permissible under the sentencing guidelines. The sentence shall be run concurrently to the sentence in count 1. The *1103 defendant need not be present for resentencing.
Affirmed in part; reversed in part and remanded for resentencing.
NOTES
[1] This is not to say that whenever other crimes are introduced by the state for purposes of proving identity the same rigid similarity requirement is necessary. The case law clearly allows for the introduction of dissimilar collateral crimes where identity is sought to be established by means other than modus operandi or common plan or scheme. See, Parker v. State, 456 So.2d 436 (Fla.1984) (no error found in allowing into evidence defendant's admission that he shot a man in Washington, D.C. because evidence was relevant to prove identity of defendant as perpetrator of charged murder where bullet in D.C. shooting was linked by ballistics to bullet which killed victim in Miami); Ratushinak v. State, 517 So.2d 749 (Fla. 4th DCA 1987) (where assailant stated to victim that "he was on the run" and that he "had escaped from jail" and defendant when arrested later that night admitted to police that he had just gotten out of the Broward County Jail the night before, testimony that the defendant had been released from jail the previous evening was admitted as relevant to show that the defendant was the perpetrator of the crime the morning following his release, notwithstanding that the testimony also revealed that the defendant had been in custody for an unrelated crime), rev. denied, 525 So.2d 880 (Fla.1988); Henderson v. State, 304 So.2d 537 (Fla. 3d DCA 1974) (perpetrator's fingerprint found at crime scene, exemplar of defendant's fingerprint taken at booking on a separate crime admissible to prove identity of defendant as the perpetrator of charged crime).
[2] In Suarez v. State, 95 Fla. 42, 115 So. 519, 526 (1928), the Supreme Court of Florida stated:

[W]here the nature of the crime is such that guilty knowledge must be proved, evidence is admissible to prove that at another time and place, not too remote, the accused committed or attempted to commit a crime similar to that charged. In other words guilt cannot be predicated upon mere commission of an act, guilty knowledge may be proved by evidence of complicity in similar offenses.
See also, Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959); Andrews v. State, 172 So.2d 505 (Fla. 1st DCA 1965).
[3] Trepal v. State, 621 So.2d 1361 (Fla.1993) (Defendant was charged with first degree murder by poisoning the victim. At trial the state introduced evidence that in the 1970's the defendant was involved in an amphetamine laboratory. A witness described the defendant as the chemist and "mastermind" of the lab. The Supreme Court held that the evidence was properly admitted to establish the defendant's knowledge of chemistry and poison to show that he had the requisite knowledge to commit the crime.), cert. denied, 510 U.S. 1077, 114 S.Ct. 892, 127 L.Ed.2d 85 (1994); Shapiro v. State, 345 So.2d 361 (Fla. 3d DCA) (In murder prosecution, victim's widow testified that she called the defendant on the eve of her husband's murder because she was concerned about the latter's whereabouts. She questioned the defendant as to who sold the boat to her husband. Defendant told her he did not know her husband owned a boat. The Court held that testimony as to the defendant's participation in the sale of the boat (which the defendant knew to be stolen) to the victim was relevant to show he had knowledge of the boat's existence in light of his denial of that fact, as well as the boat's proposed use to dispose of the victim's body, to prove his involvement in the murder, conspiracy and his relationship with the other two participants), cert. denied, 353 So.2d 678 (Fla.1977).