# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-3716
_____

THELMA DENISE LOWERY,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Santa Rosa County.
Kelvin C. Wells, Judge.

June 20, 2019

WOLF, J.

Thelma Lowery challenges her conviction for first-degree felony murder while in the commission of aggravated child abuse. She raises 6 issues on appeal. We find that none of them have merit and affirm.

Appellant was charged by grand jury indictment. The indictment expressly alleged that she committed aggravated child abuse "by committing aggravated battery . . . and/or knowingly or willfully abusing [the victim] and in doing so caused great bodily harm, permanent disability or permanent disfigurement . . . in violation of Sections 782.04 and 827.03, Florida Statutes."

The State's theory of the case was that appellant ran a daycare facility in her home and that a perfectly healthy 15-month-old child died of a head injury caused by appellant while the baby was in her care.

We will discuss the pertinent facts as they relate to each issue.

### ISSUE I: WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR JUDGEMENT OF ACQUITTAL

Appellant argues the trial court erred in denying her motion to dismiss because the State's evidence was circumstantial and did not rebut her reasonable hypothesis of innocence that the child died of an underlying medical condition. *See State v. Law*, 559 So. 2d 187 (Fla. 1989). Multiple medical experts, including the treating physicians and the medical examiners, testified the child died from a blunt force trauma to his brain, possibly in combination with a violent shaking. They testified his injuries were not consistent with an underlying medical condition or accidental fall. Both medical examiners testified the child would have suffered symptoms "immediately" following the head trauma.

Appellant and the child's parents agreed that the child was not symptomatic when he was dropped off at appellant's house that morning at approximately 7:00 a.m. Appellant agreed the child was not symptomatic until he vomited and had a seizure approximately 3 hours later at 10:00 a.m., at which time she called 911. Appellant conceded she was the only adult with the child that morning.

In a similar case, the Second District found testimony from medical experts that a young child died from a serious head injury, which could not have been caused by an accidental fall while in the sole care of the defendant, was sufficient circumstantial evidence to prove felony murder by aggravated child abuse and to rebut a hypothesis of innocence that the child accidentally rolled off the bed. *Tate v. State*, 136 So. 3d 624, 629 (Fla. 2d DCA 2013). *See also Caban v. State*, 892 So. 2d 1204 (Fla. 5th DCA 2005), *cause dismissed*, 909 So. 2d 861 (Fla. 2005) (finding expert medical testimony that a child died of head

2

trauma that was caused by shaken baby syndrome and could not have been caused by an accidental fall was sufficient circumstantial evidence to prove felony murder by aggravated child abuse and to rebut a hypothesis of innocence that the child fell off the bed or was injured at a prior time).

In addition, here the State presented other evidence suggesting appellant's guilt. A *Williams* Rule witness testified that appellant frequently treated the child in a rough manner that the medical examiner testified could have led to the child's death. Appellant also made statements that were inconsistent and evidenced consciousness of guilt. Appellant told multiple individuals at the time of the incident, including first responders and a detective, that she feared she would be blamed for harming the child despite there being no evidence at that time that he had been injured. When asked what happened to the child, she suggested to the child's parents and a detective that the child's injuries were caused when his 3-year-old brother hit him in the head with a block, which all of the doctors testified could not have caused the victim's injuries. She also stated multiple times that she had just bathed the child and washed vomit out of his hair when he had his seizure, though first responders testified he was dry and did not smell as if he had been freshly bathed.

Viewing this evidence in a light most favorable to the State, the State presented sufficient evidence that appellant caused the child's death by committing aggravated child abuse.

The theory of defense, as presented by the defense expert Dr. Willey, was that the child suffered from pre-existing medical conditions that rendered the veins in his head highly susceptible to injury and subject to bleeding either spontaneously or from minor trauma.

First, Dr. Willey believed the child had an excess accumulation of fluid on his brain since birth, which would have increased the pressure in his head and stretched the veins in his brain, making them more susceptible to injury. He testified this condition could have caused the child's veins to bleed and re-bleed on their own or due to minor trauma. Primarily he believed the child had an accumulation of fluid on his brain because his head grew at a disproportionately larger rate than the rest of his

3

body since birth. He prepared two growth charts for the jury to demonstrate this disproportionate growth. He believed the possibility of excess fluid was also supported by the report from a CT scan that indicated there was "chronic" or older fluid on the child's brain prior to surgery, and the surgeon's report stating there was a chronic membrane in the child's brain. This led him to believe the child's weakened veins may have been bleeding and re-bleeding leading up to the incident.

The State refuted all of his testimony. Both the medical examiner and the child's pediatrician testified the child's head did not grow at an abnormally large rate. It grew consistently with the rest of his body. The defense expert conceded he did not use a growth chart for premature babies. The victim in this case was born prematurely. The pediatrician testified a premature baby's growth would not plot accurately on a full-term baby's growth chart. The pediatrician plotted the child's growth on the appropriate chart and concluded the child's head grew consistently with the rest of his body. The medical examiner also charted the child's growth and concluded his head grew normally. She pointed out the defense expert made significant errors in plotting the child's growth, including putting the wrong measurement in one spot and putting the wrong month's measurements on the wrong line in another spot. She stated there was no sign the child had excess fluid on his brain.

Although the report for the CT prepared by the radiologist Dr. Waggoner did conclude there was "chronic" or old blood present on the child's brain, the neurosurgeon testified he saw no old blood during surgery. He believed the radiologist made a mistake in reading the CT scan.

One of the medical examiners, Dr. Nelson, testified that the child had a "chronic" membrane, indicating the child had bleeding on his brain one to two weeks prior to his death. Appellant argues that because of this testimony, the State was unable to rule out the possibility of an underlying medical condition causing the child's death. However, Dr. Nelson conclusively testified that the chronic membrane represented a separate bleed that would have been caused by a separate incident weeks earlier. He stated it was a "marker" to show

4

"there's been trouble" there before. He stated this type of bleeding or "hematoma" in children does not tend to re-bleed. It was not possible that the child "magically" started experiencing symptoms from the old bleed weeks later. Dr. Minyard gave similar testimony.

Thus, the State directly rebutted all three reasons why the defense expert believed the child had excess fluid on his brain.

Second, the defense expert testified be believed the child had abnormal "bridging veins" in his brain, which would have been susceptible to rupturing from little to no force. He reached this conclusion that the child had a venous abnormality based on a note in the surgeon's records that veins where the bleeding occurred were "conglomerated." The defense expert stated "conglomerated" was not a description of a normal "venous architecture" in an infant's brain and instead indicated a malformation.

However, Dr. Pearson, the neurosurgeon, testified the "conglomeration" of bridging veins was a "normal variant," and the child did not have any venous abnormality. Dr. Minyard, one of the medical examiners, also testified the child did not have any venous abnormalities.

Thus, the State directly refuted both reasons underlying the defense expert's theory that the hemorrhaging on the child's brain was caused by an underlying medical condition that made his veins more prone to bleeding, rather than a serious head trauma. As such, the State met its burden to refute the hypothesis of innocence.

ISSUE II: WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING *WILLIAMS* RULE EVIDENCE BECAUSE ITS PROBATIVE VALUE WAS OUTWEIGHED BY ITS PREJUDICIAL EFFECT

Appellant argues the trial court abused its discretion in admitting as *Williams* Rule evidence the testimony of J.B., who stated appellant would punish the child by picking him up by his feet and plopping him onto the couch.

5

The *Williams* Rule, which was first set forth in *Williams v. State*, 110 So. 2d 654, 656 (Fla. 1959), and was later codified by section 90.404, Florida Statutes, states:

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

§ 90.404(2)(a), Fla. Stat.

Here, appellant argues the State sought to admit J.B.'s testimony to prove appellant's intent to maliciously punish the child. However, appellant argues this testimony was inadmissible for several reasons. First, she argues intent was not a material fact in this case because she claimed she did not cause the child's injuries at all. She did not claim she caused them accidentally or by mistake. Second, she argues the prior incidents were not sufficiently similar to the charged offense. Third, she argues any probative value was significantly outweighed by prejudicial effect because the State sought to admit this testimony to prove she maliciously punished the child, though she was not charged with malicious punishment.

The State correctly notes that appellant did not preserve most of these arguments. The only argument appellant raised below was that the incidents were not sufficiently similar to the charged offense. She did not allege that evidence of punishment was inadmissible or that her intent was not at issue. In her reply brief, appellant concedes she did not expressly preserve these issues but asserts that her objection to the admissibility of this testimony was sufficient to put the trial court on notice that an error may have been committed. However, "[f]or an issue to be preserved for appeal, . . . it 'must be presented to the lower court and the *specific* legal argument or ground to be argued on appeal must be part of that presentation if it is to be considered preserved.'" *Archer v. State,* 613 So. 2d 446, 448 (Fla. 1993) (quoting *Tillman v. State*, 471 So. 2d 32, 35 (Fla. 1985) (emphasis added)). Because the only specific argument appellant raised

6

below was that the incidents were not sufficiently similar, that is the only argument she preserved for appeal. The other arguments were waived. Regardless, they are also without merit.

Appellant's intent was a material fact in issue because she was the only adult with the child when he fell ill, and she suggested his injuries were caused either accidentally when his brother hit him in the head with a block, or by an underlying medical condition, or both.

In arguing her intent was not at issue, appellant relies on *Jackson v. State,* 140 So. 3d 1067, 1070–71 (Fla. 1st DCA 2014), in which this court held the mere fact that a defendant pled not guilty did not make his intent a material fact at issue, particularly where he denied all involvement in the incident.

In *Jackson*, the defendant was charged with burglary, battery, and stalking after he allegedly broke into his ex-girlfriend's house and attacked her with a knife. *Id.* at 1070. Over objection, the State presented *Williams* Rule evidence about two prior instances in which he attacked the victim. *Id.* The State claimed this evidence was relevant to show intent. However, the theory of defense was that the defendant was not involved in the incident at all. *Id.* at 1071. The defendant did not claim self-defense, accident, or mistake. He did not claim he had permission to be in his ex-girlfriend's home. He denied being there at all. *Id.* Further, at trial the prosecutor did not argue that the prior incidents showed the defendant's intent. Instead, the prosecutor argued the intent was shown by the time and manner in which he entered the house. The sole probative value of the prior incident seemed to be to show propensity. However, that was "precisely the type of reasoning against which the *Williams* rule is intended to protect." *Id.* at 1072. This court concluded that intent was not a material issue simply by virtue of the fact the defendant pled not guilty, and as such the *Williams* Rule evidence was not admissible. *Id.*

Appellant argues the case at hand is similar because here, as in *Jackson*, she did not put the element of intent at issue. She reasons that because she claimed she did nothing to hurt the child at all, and she did not raise a defense of accident or mistake, there was no material dispute as to intent. However,

7

unlike in *Jackson*, appellant did not claim to have been totally absent from the scene of the crime. She conceded she was the only adult present when the child suffered the effects of his injuries, which the experts testified would have manifested immediately upon infliction of the injury. Also, she suggested to many individuals that the injuries were caused accidentally when the child's brother hit him with a block. Thus, this case is materially different than *Jackson*.

Prior instances of abuse are admissible as *Williams* Rule evidence in prosecutions for aggravated child abuse or murder to prove identity, intent, or absence of accident or mistake, particularly where the defendant claimed the injuries were caused by accident. These prior instances of abuse do not have to be identical to the incident for which the defendant was charged.

"Even without the requisite higher degree of similarity to prove identity, evidence of other crimes, wrongs, or acts may properly be used to prove, e.g., motive, intent, plan, or absence of mistake." *Washington v. State*, 737 So. 2d 1208, 1224 (Fla. 1st DCA 1999). This court emphasized that the term "similar fact evidence" is "misleading" because evidence is admissible under the *Williams* Rule "not because it is similar to the crime or act in issue, but because it is relevant to prove a material fact or issue." *Id.* at 1223 (quoting C. Ehrhardt, *Florida Evidence*, § 404.9 at 174 (1999 ed.)).

In *Washington*, medical experts testified that a baby died because someone "repeatedly grabbed" and "violently shook or twisted him" and may have "punched him with the knuckles." 737 So. 2d at 1224-25. This court found evidence that the child's mother had repeatedly and recently punched the child with her knuckles, knocked him into the ground, snatched him by the arm, and shook him was "relevant to show her intent, plan, or state of mind toward [the child.]" *Id.* at 1225. Even though these prior acts may not have risen to the level of aggravated child abuse, this court was "unable to conclude that the evidence of [the mother's] very recent, ongoing acts of violence on the same 11-month-old child would have to rise to the level of aggravated child abuse . . . before they became relevant to suggest who fatally injured the child shortly thereafter." *Id.* The court

8

emphasized these prior acts were "clearly distinguishable from socially more acceptable behavior such as reasonable spanking." *Id.* at n.8. The court also emphasized that since *Williams*, the supreme court has "adhered to a broad rule of admissibility based on the relevancy of the evidence to a fact to be proved." *Id.* at 1225 (quoting *Snowden v. State*, 537 So. 2d 1383, 1384 (Fla. 3d DCA 1989)).

Other courts have similarly concluded that prior instances of abuse committed by the defendant against a particular child were admissible where the defendant was charged with abusing that child, especially where the defendant suggested either to police or during trial that the child's injuries may have been the result of an accident. In *Kirkland-Williams v. State*, 230 So. 3d 580, 583 (Fla. 2d DCA 2017), a defendant charged with first-degree felony murder while engaged in aggravated child abuse argued *Williams* Rule evidence of prior instances of child abuse were "not relevant when his defense was not that [the victim's] death was a mistake or accident, but instead that [he] did not cause the injuries that ultimately killed [the victim]." The Second District rejected this argument, finding even though the defendant did not raise the defense of accident at trial, he made claims to detectives prior to trial "suggesting [the victim's] injuries were accidentally sustained" when the child bumped his stomach on a dresser and fell off the bed and hit his head. *Id.* at 583-84. The court also found the *Williams* Rule incidents were "strikingly similar" and close in time to the offense. *Id.* at 583. Thus, the incidents were admissible to prove absence of accident, intent, identity, and opportunity. *Id.* at 583-84.

In *Evans v. State*, 693 So. 2d 1096, 1102 (Fla. 3d DCA 1997), the Third District broadly concluded that "where the state seeks to present evidence of prior physical abuse committed by the defendant upon the same child for the purpose of proving intent and/or absence of mistake or accident [rather than identity or modus operandi], there is no need for factual similarity between the charged offense and the prior abusive conduct beyond the existence of physical abuse in all instances." In *Evans*, a young child died from a ruptured liver consistent with a blow to the child's back. He also had multiple broken ribs and bruises of various ages covering his entire body. *Id.* at 1097-98. The

9

defendant admitted to physically disciplining the child but presented evidence suggesting the fatal injury could have been caused by the child playing football with older boys or falling out of a bunk bed. *Id.* at 1099. The State presented *Williams* Rule evidence that the defendant had consistently beaten the child over the course of the year leading up to the child's death and had nearly drowned the child intentionally on one occasion. *Id.* at 1098-99.

The *Evans* court rejected the defendant's argument that the incidents were not sufficiently similar to be admissible as *Williams* Rule evidence. *Id.* at 1102. The court found the "prior instances of physical abuse were significant, relevant and properly admitted to prove intent and the absence of mistake or accident," particularly in light of the theory of defense that the injuries were caused accidentally by a fall and a football game. *Id.* Alternatively, even if the defendant had not raised these theories of defense, the court found the evidence would have been admissible for the same reasons. *Id.* (citing *Estelle v. McGuire*, 502 U.S. 62 (1991) (finding under California law evidence of prior instances of child abuse were admissible to prove intent regardless of the fact the defendant did not make a claim of accidental death because "the prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense")).

In this case, though the prior instances of plopping the child down onto the couch by his feet may not have risen to the level of aggravated child abuse, they are strikingly similar to if not the very cause of death here. The medical examiner testified that the same actions described by the *Williams* Rule witness - picking the child up by his feet, swinging him out, and plopping him down, hitting his head - would have caused a "blunt impact" to his head, which was the cause of death. There was a bruise on the child's scalp consistent with the location of the ruptured veins in his head, suggesting his head was hit against something. There were also bruises on the child's legs. These injuries are consistent with the child being picked up by his legs and plopped down.

10

The *Williams* Rule evidence was admissible to prove intent and lack of an accident.

ISSUE III: WHETHER THE TRIAL COURT ERRED IN GIVING A JURY INSTRUCTION ON AGGRAVATED CHILD ABUSE BY MALICIOUS PUNISHMENT WHEN IT WAS NOT ALLEGED IN THE INDICTMENT

Appellant argues the trial court abused its discretion in instructing the jury on aggravated child abuse by malicious punishment because that means of committing aggravated child abuse was not alleged in the indictment.

Section 827.03(1)(a)1.-3., Florida Statutes, states aggravated child abuse can be committed in 3 different ways:

(a) "Aggravated child abuse" occurs when a person:

1. Commits aggravated battery on a child;

2. Willfully tortures, maliciously punishes, or willfully and unlawfully cages a child; or

3. Knowingly or willfully abuses a child and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to the child.

The indictment alleged that appellant committed felony murder causing the death of the child while engaged in the first and third ways this offense can be committed: "aggravated child abuse . . . by committing *aggravated battery* on [the victim] and/or *knowingly or willfully abusing [the victim] and in doing so caused great bodily harm, permanent disability or permanent disfigurement*." It did not allege malicious punishment.

During the charge conference, appellant objected to an instruction on malicious punishment because it was not alleged in the indictment. While appellant is correct that the instruction should not have been given, based on the evidence presented and the jury's finding that the actions of appellant caused the death of the victim, there is no reasonable possibility that any malicious punishment in this case did not also constitute the charged crime of aggravated battery.

11

The general rule is "where an offense may be committed in various ways, the evidence must establish it to have been committed in the manner charged in the indictment. . . . If one of the state of facts is alleged, it cannot be established by proof of another." *Brown v. State*, 41 So. 3d 259, 262 (Fla. 4th DCA 2010) (quoting *Zwick v. State*, 730 So. 2d 759, 760 (Fla. 5th DCA 1999)). *See also Long v. State*, 92 So. 2d 259, 260 (Fla. 1957).*

In *Brown*, the information charged the defendant with aggravated child abuse by two of the statutory means - willful torture, malicious punishment, or unlawful caging; and knowingly or willfully abusing the child causing great bodily harm, permanent disability or permanent disfigurement. 41 So. 3d at 260-61. It did not allege the third statutory means – aggravated battery, nor did it allege use of a deadly weapon. *Id.* The State presented evidence that the defendant grabbed a teenager's hair and banged her head onto the floor. When she left the house, she slipped and fell, and the defendant hit her in the head with a bat. *Id.* The defendant admitted to the altercation and to grabbing the bat, though he claimed he did so because he feared he might need it to protect his son. He denied hitting the girl with the bat, stating she injured her head when she fell. *Id.* The prosecutor invited the jury to convict based on aggravated battery with a deadly weapon – the bat. *Id.* Similarly, the court instructed the jury it could convict if it found the defendant touched or struck the child against her will and in doing so either "intentionally or knowingly caused great bodily harm, permanent disability, permanent disfigurement, *or used a deadly weapon.*" *Id.* at 261.

---

* "[I]t is fundamental error to instruct the jury on a theory of the crime not charged in the information where evidence and argument are presented on the uncharged theory," because "under such circumstances it will ordinarily be 'impossible to determine whether the defendant was convicted of a charged or uncharged offense,'" and "it is a due process violation to convict a defendant of a crime with which he was not charged." *Brown v. State*, 41 So. 3d 259, 262 (Fla. 4th DCA 2010) (quoting *Cogbill v. State*, 940 So. 2d 537, 539 (Fla. 1st DCA 2006)).

The Fourth District found it was possible that the jury found the defendant guilty based on a theory that he caused great bodily harm, which was charged. *Id.* at 262. However, it was also possible the jury convicted based upon the defendant's use of a deadly weapon, particularly because the State invited the jury to convict based on the deadly weapon, and the evidence of great bodily harm was "debatable." *Id.* Thus, the court found the conviction was fundamental error. *Id.* It reversed and remanded for a new trial. *Id.* at 263.

However, instructing a jury on an uncharged theory of an offense does not always result in reversible error. In *Cogbill v. State*, 940 So. 2d 537, 538 (Fla. 1st DCA 2006), the defendant was charged with trafficking in methamphetamine by actual or constructive possession. However, the jury was instructed it could convict if it found the defendant "manufactured or possessed" methamphetamine. *Id.* This court reasoned it was "entirely possible to conclude [the defendant] was not convicted of an uncharged crime" because the court could "conceive of no circumstance, particularly under the facts of this case, whereby one could engage in the act of manufacture, as that term was defined, without also being in actual or constructive possession of the prohibited substance." *Id.* at 540. Because "the acts constituting manufacture are wholly subsumed within the more broadly defined circumstances constituting actual or constructive possession, it can be *determined with certainty* that instructing the jury on the uncharged alternative of manufacture did not result in a circumstance in which [the defendant] was *at risk* of being convicted of an uncharged crime." *Id.* (emphasis added).

A person can commit malicious punishment without committing an aggravated battery. However, there was no evidence here of a punishment that was not also a battery. "[A]ggravated battery" occurs when a person commits a battery and in doing so "[i]ntentionally or knowingly causes great bodily harm, permanent disability, or permanent disfigurement," or uses a deadly weapon. § 784.045(1), Fla. Stat. There was no evidence or instruction pertaining to a deadly weapon here. Thus, to find aggravated battery, the jury would have needed to find that a battery was committed that caused great bodily harm. Similarly, the other charged theory of the offense expressly

requires that the defendant "[k]nowingly or willfully abus[ed] a child and in doing so cause[d] great bodily harm, permanent disability, or permanent disfigurement." § 827.03(1)(a)3., Fla. Stat. Based on the jury's finding that the actions of appellant caused the death of the child, coupled with the only facts that were proven and argued to the jury that any punishment involved an illegal touching resulting in great bodily harm, it can be determined with certainty that appellant was not at risk for being found guilty of an uncharged crime.

Similarly to *Cogbill*, it can be conclusively determined based on the facts of this case and the jury's determination that appellant caused the death of the child that the jury did not find appellant guilty of an uncharged offense. The jury must have found appellant caused great bodily harm to the child as a result of a battery, which was properly charged in the indictment.

ISSUE IV: WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON MANSLAUGHTER BY CULPABLE NEGLIGENCE IN THE ABSENCE OF EVIDENCE OF NEGLIGENCE

Appellant argues the trial court abused its discretion in instructing the jury on manslaughter by culpable negligence. At trial, defense counsel objected that there was no evidence of negligence. Instead, the State's witnesses testified that the cause of death was non-accidental trauma, and negligence was not alleged in the indictment. Appellant cites *Griffin v. State*, 160 So. 3d 63, 68 (Fla. 2015), for the general proposition that "[a] homicide found to be unlawful is not automatically just one offense, but will be one of several possible homicide offenses depending upon the nature of the intent or the lack of any intent at the time of the homicide." She argues it was reversible error to instruct the jury on an offense for which no evidence was presented.

The trial court correctly noted that manslaughter is a category 1, necessarily lesser included offense to first-degree felony murder. *See* FL ST CR JURY INST 7.3; *see also Clark v. State*, 43 So. 3d 814, 816 (Fla. 1st DCA 2010) (quoting *Moore v. State*, 932 So. 2d 524 (Fla. 4th DCA 2006) ("The schedule of lesser included offenses [found in the standard jury instructions] is designed to be a complete, authoritative compilation that is

14

presumed to be correct and upon which a trial court can confidently rely.")).

"Necessarily lesser included offenses are those offenses in which the statutory elements of the lesser included offense are always subsumed within those of the charged offense." *Sanders v. State*, 944 So. 2d 203, 206 (Fla. 2006). "A 'necessarily lesser included offense' is, as the name implies, a lesser offense that is always included in the major offense. The trial judge has *no discretion* in whether to instruct the jury on a necessarily lesser included offense. Once the judge determines that the offense is a necessarily lesser included offense, an instruction must be given." *State v. Wimberly*, 498 So. 2d 929, 932 (Fla. 1986) (emphasis added). Such an instruction must be given even if the "judge determines there is no supporting evidence." *Id.* at 930.

Here, because manslaughter was a category 1 necessarily lesser included offense to first-degree felony murder, the trial court had "no discretion" in whether to give the instruction, even if the evidence did not support it. *See* FL ST CR JURY INST 7.3; *Wimberly*, 498 So. 2d at 932. Appellant has presented no authority that would have permitted the trial court to exclude a portion of the instruction on manslaughter.

Regardless, the evidence would have supported a finding of manslaughter by culpable negligence. "[C]ulpable negligence" was defined for the jury in part as "a course of conduct showing reckless disregard of human life or of the safety of persons exposed to its dangerous effects, or such an entire want of care, as to raise a presumption of a conscious indifference or consequence, or which shows wantonness or recklessness, or a grossly careless disregard for the safety and welfare of the public or such an indifference to the rights of others as is equivalent to an intentional violation of such rights."

The State argues the jury could have found that appellant's habit of picking the child up by his feet and plopping him on the couch showed reckless indifference for the child's safety. The State is correct.

ISSUE V:  WHETHER THE TRIAL COURT ERRED IN DENYING
APPELLANT'S MOTION FOR A MISTRIAL

The comment complained of by appellant was brief and isolated. It did not become a feature of the trial. The court gave a clear curative instruction. There is no reasonable possibility that it contributed to the verdict.

ISSUE VI:  WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN
LIMITING THE DURATION OF CLOSING ARGUMENTS RIGHT BEFORE
CLOSING ARGUMENTS

Appellant argues the trial court abused its discretion in limiting counsel to an hour for closing arguments given the length of the trial, the number of witnesses, the complexity of the medical testimony, and the fact that counsel had prepared based on the court's initial grant of 1.5 hours for closing arguments.

"[T]he time limit to be placed on closing arguments of counsel is left to the sound discretion of the trial court." *Simmons v. State*, 753 So. 2d 700, 702 (Fla. 5th DCA 2000). However, "the time limit set must be reasonable. What constitutes a reasonable time depends upon the facts and circumstances of each particular case." *Stockton v. State*, 544 So. 2d 1006, 1009 (Fla. 1989).

In *Stockton*, the supreme court found a 30-minute limitation on closing arguments was unreasonable. The defendant in that case was charged with a serious offense, second-degree murder. *Id.* The trial lasted 2 days with 15 witnesses testifying, and all of the State's witnesses were impeached with inconsistent prior statements. The defense had two viable theories of defense, including two witnesses who testified someone else confessed. *Id.* However, defense counsel forgot to mention the confession during closing arguments because he felt so rushed. *Id.* at n.2. The trial court interrupted counsel when his 30 minutes were up and gave him only 3 additional minutes to compensate for time taken up by the prosecution's objections. *Id.* at n.2. The trial court set the 30-minute time limit primarily for the convenience of the jury, so they could finish before the weekend. *Id.* at 1009. Taking all of these factors into consideration, the supreme court found the trial court abused its discretion in limiting the time for closing arguments, depriving the defendant of a fair trial. *Id.*

16

In this case, when counsel objected that she needed the full 1.5 hours for which she prepared, the trial court explained the reason for the time limit was that it did not want counsel "talking about the same thing over, and over, and over again." However, the court stated that "if it's something that's new, then I'm going to let you talk about it . . . . [I]f you get to the end of your hour and you hadn't discussed everything, I'm going to give you leave to talk about things you didn't talk about." Counsel took the court up on this offer. Towards the end of the 1-hour time period, counsel asked the court for 10 more minutes, and the court granted it.

Unlike *Stockton*, the court's rationale for limiting closing arguments was not mere convenience. The court wanted to limit needless repetition. It gave appellant's counsel the extra time she requested. Unlike *Stockton*, appellant failed to identify anything that counsel was unable to cover within that timeframe. Thus, the court did not abuse its discretion in limiting the time for closing arguments. Thus, appellant's judgment and sentence are AFFIRMED.

MAKAR and M.K. THOMAS, JJ., concur.

———————————————

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

———————————————

Andy Thomas, Public Defender, and A. Victoria Wiggins, Assistant Public Defender, Tallahassee, for Appellant.

Ashley Moody, Attorney General, and Quentin Humphrey, Assistant Attorney General, Tallahassee, for Appellee.